NORMAN E. SMOOT AND TOMMI L. SMOOT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smoot v. Commissioner
Docket No. 33352-87
United States Tax Court
T.C. Memo 1991-268; 1991 Tax Ct. Memo LEXIS 306; 61 T.C.M. (CCH) 2897; T.C.M. (RIA) 91268; June 11, 1991, Filed *306 Decision will be entered under Rule 155. Donald W. Muir, Jr., and Irwin D. Zucker, for the petitioners. Bruce W. Kent, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax and Increased Interest
Year
Deficiency
[1]Sec. 6653(a)(1) Sec. 6653(a)(2)
Sec. 6661
Sec. 6621(c)
1983
$ 57,508.00
$ 2,875.40
*
$ 14,217.25
**
1984
66,616.76
3,330.84
*
16,654.19
**
The issue presented is whether petitioners *307 are entitled to deductions for depreciation and interest arising from the purchase and leaseback of certain peripheral computer equipment. FINDINGS OF FACT The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Norman E. Smoot and Tommi L. Smoot, husband and wife, resided in San Antonio, Texas, at the time their petition in this case was filed. Petitioners filed a timely joint U.S. Individual Federal Income Tax Return for 1983 with the Internal Revenue Service in Austin, Texas. Petitioners' joint return for the taxable year 1984 was filed on October 15, 1985. On October 28, 1986, petitioners executed a Special Consent to Extend the Time to Assess Tax (Form 872-A) for the period ended December 31, 1983. Respondent mailed a notice of deficiency to petitioners on July 13, 1987. This case involves a leveraged lease transaction entered into by petitioner [2] in December 1983. The parties to the transaction were as follows: (1) The end-user, Chase Manhattan Bank (Chase), which had use of the equipment for a period of time as specified in its lease; (2) the leasing company, Thomas Nationwide Computer Corporation (Thomas), *308 which purchased the equipment, placed it with the end-user, and served as the remarketing agent for the equipment; (3) an intermediary entity, Intercontinental Investors Group, Inc. (IIG), which purchased the equipment from Thomas and provided administrative services during the life of the lease; and (4) petitioner, who purchased the equipment from IIG, simultaneously leased it to Thomas, accrued tax benefits associated with ownership, and sought to realize any potential profits from sharing in both lease rental income and sale proceeds on the equipment. Structure of Petitioner's Sale and Leaseback Transaction
A. Purchase and Lease by Thomas
In the fall of 1983, Chase desired to lease certain IBM computer equipment. Thomas was selected by Chase as the third-party leasing company for a lease transaction. Undertaking the Chase lease was part of Thomas' efforts to establish an equipment-leasing division. Previously, Thomas had been involved *309 in the purchase, restoration, and resale of used equipment. In November 1983, Thomas purchased $ 900,453 of peripheral equipment [3] from IBM consisting of the following: Quantity
Machine Type
Description
2 3705-L01
Communication Control Unit
6 3706-L01
Communication Control Unit
4 3274-C41
Control Unit
1 3274-D41
Control Unit
1 3274-C01
Control Unit
8 3274-D01
Control Unit
14
3274-D31
Control Unit
1 3274-A01
Control Unit
2 3274-C21
Control Unit
1 3274-C61
Control Unit
2 3274-C31
Control Unit
2 3274-D21
Control Unit
3 3276-002
Control Unit/Display Station
3 3276-004
Control Unit/Display Station
16
3278-004
Display Station
4 3279-S3G
Display Station
47
3287-002
Printer
1 3289-002
Printer
The $ 900,453 purchase price included $ 70,463.80 in discounts from IBM. Thomas *310 subsequently leased this equipment to Chase pursuant to a master equipment lease executed by the parties on November 29, 1983. The lease was a net lease. It also provided that Thomas retained the right to depreciation, interest deductions, and the investment tax credit. Chase's initial lease term varied depending on the equipment, which was leased in groups to various Chase branch offices. Of these groups, 9 equipment groups had a lease term of 3 years, 1 group had a lease term of 2-1/2 years, and 14 lease groups had a lease term of only 2 years. Total monthly rent due from Chase for the 2-year period November 30, 1983 - November 30, 1985, was $ 32,635. Total monthly rent due for the period December 1, 1985 - November 30, 1986, was $ 1,619. The lease did not grant Chase options to terminate, renew, or purchase. However, Chase, on its own initiative could re-lease the equipment if it chose to do so. B. Sale by Thomas to IIG
On December 16, 1983, Thomas sold the peripheral equipment to IIG for approximately $ 900,000. In return for the equipment, IIG paid 12 to 14 percent of the cost to Thomas in cash and also executed a promissory note/security agreement in the face *311 amount of $ 783,394 at a rate of 10.30 percent. The purchase agreement stated that IIG acquired the equipment subject to the lease between Thomas and Chase, and subject to Thomas' security interest in the equipment and any proceeds from its sale, insurance, or rental. On December 16, 1983, Thomas and IIG also executed a remarketing agreement. The agreement appointed Thomas as IIG's agent to remarket the equipment, by sale or re-lease, upon termination of any lease between Thomas and any party to whom IIG sold the equipment. As compensation for these services, Thomas was to receive 10 percent of any net sale or lease proceeds (net remarketing proceeds). The remarketing agreement recognized that the equipment would be sold by IIG to petitioner and subsequently released to Thomas. C. IIG's Sale to Petitioner
On December 15, 1983, [4] petitioner executed a written agreement to purchase the peripheral equipment from IIG for a specified purchase price of $ 900,453. This was payable in $ 38,539 cash down and four recourse promissory notes in the aggregate sum of $ 141,551 payable as follows: Note due 3/15/84 at 15 percent
$ 18,009.00
Note due 6/30/84 at 15 percent
32,236.00
Note due 1/31/85 at 15 percent
45,653.00
Note due 1/31/86 at 15 percent
45,653.00
*312 The balance of the purchase price was payable pursuant to a long-term nonrecourse note commencing in July 1984 as follows: 7-year installment note
$ 720,363.00
(14 semi-annual payments of $ 79,917.42 at 13 percent)  The amount and timing of petitioner's payments to IIG on the long-term note mirrored IIG's payments on its debt to Thomas. Petitioner paid the cash downpayment and the short-term notes with interest as they came due. Including interest, these payments totaled $ 205,649.03. Including interest, petitioner's debt service on the long-term note was $ 1,118,843.80. Including interest, petitioner's total cash outlay for the purchase of the IBM computer equipment was $ 1,324,492.80. *313 The purchase agreement also appointed IIG as petitioner's agent to administrate the collection of rents due from Thomas as lessee. IIG could offset such monies against payments due from petitioner, and IIG was to receive a fee for such collection service equal to any interest earned on rents in excess of debt service. At the time of trial, IIG was charging a 10-percent managerial fee on gross additional rents collected. The purchase agreement required petitioner to warrant that in making his investment decision, he relied solely upon an independent investigation made by him or his duly appointed or qualified representative. He also had to warrant that he understood that no Federal agency had yet made any finding or determination as to the fairness of the equipment investment. The purchase agreement between petitioner and IIG specified that the equipment purchase was subject to the lease between Thomas and Chase and Thomas' security interest in the equipment arising out of the note between IIG and Thomas. Additionally, petitioner executed a security agreement giving IIG a security interest in the equipment and its proceeds and noting that IIG's interest was subordinate to Thomas' *314 security interest in the same equipment. Despite this subordinated position, no provision was made for recovery against petitioner individually in the event the equipment or its proceeds were insufficient to satisfy petitioner's debt to IIG. In fact, the agreement also included the following deferral clause, which indicated that repayment of the note was contingent upon receipt of rental income and that IIG looked only to the equipment for repayment: 3.2 Deferral
In the event the Lease [between petitioner and Thomas] is terminated prior to the expiration of the Lease Term on account of an Event of Default as defined thereunder, then, notwithstanding anything herein to the contrary, the entire unpaid principal amount of this Note, together with all interest accrued hereunder, shall be deferred without further accrual of interest during the period of such deferral and shall not be due and payable until August 31, 1997, at which time all such unpaid principal and accrued interest shall become due and payable; provided, however that, notwithstanding such deferral, to the extent the Payor shall receive any proceeds from the Equipment following a termination of the Lease as *315 aforesaid, it shall be obligated to pay such proceeds to Payee on account of the indebtedness evidenced by this Note (and such payments shall be deemed to be prepayments under this Note).
According to IIG, this provision was inserted to protect petitioner in the event that Thomas, a company new to leasing, went into bankruptcy or otherwise defaulted on its payments to petitioner. IIG's president, Howard Straus (Straus), testified that in either event, the deferral clause was intended to provide the parties with a period of time to find a substitute for Thomas and to continue the transaction. As part of the December 15, 1983, sale, IIG also assigned its rights under the remarketing agreement to petitioner. Under the terms of this assignment, Thomas became obligated to petitioner to use reasonable efforts to sell or re-lease the equipment from and after the expiration of the 7-year lease between Thomas and petitioner. Petitioner, in turn became obligated to pay Thomas 10 percent of any net proceeds from sale or re-lease of the equipment. D. Lease of the Equipment by Petitioner to Thomas
Contemporaneously with his equipment purchase from IIG, petitioner leased the equipment *316 to Thomas for a 7-year period pursuant to a December 16, 1983, lease agreement. Commencing in July 1984, the lease agreement required Thomas to pay base rentals of $ 161,634 annually for the first 5 years and $ 159,835 annually for the last 2 years. These amounts exceeded petitioner's debt payments to IIG and would have generated positive cash-flow of approximately $ 9,000. Total base rentals under petitioner's lease to Thomas were $ 1,127,844. The lease was a net lease requiring Thomas to pay taxes, insurance, and repair costs and to assume the risk of loss to the equipment. The lease also gave Thomas the right (but did not require Thomas) to sublease or assign the equipment without petitioner's consent during the 7-year lease term, and subject to certain requirements, beyond the lease term. Pursuant to a December 15, 1983, lease addendum, the parties agreed that in addition to petitioner's receipt of base rentals from Thomas, petitioner and Thomas would share in certain "additional rents." Under the addendum, petitioner would initially receive 80 percent of all rents received by Thomas on a sublease of the equipment, commencing with the 61st month of the lease (December 1988). *317 Thomas retained the remaining 20 percent as a remarketing fee. Once petitioner received $ 20,000 in additional rents, his sharing percentage would drop to 70 percent (and Thomas' would rise to 30 percent). Petitioner was to receive 70 percent of additional rentals until he had received another $ 15,000 in such income. Once he received a total of $ 35,000 in additional rental income, then any additional rental income was shared by petitioner and Thomas on a 50-50 basis. Thomas' rent-sharing amounts were separate from, and in addition to, the 10-percent fee it might receive from remarketing efforts at the termination of the lease. E. Economic Consequences
Exclusive of additional rents and sale proceeds, petitioner was to receive approximately $ 9,000 on his $ 205,649 cash investment. Thus, if petitioner failed to receive any shared rent, and the equipment lacked any residual value that could be realized on a disposition of the equipment, then the sale/leaseback resulted in a negative cash-flow of $ 196,653. [5]
*318 F. IIG and its Role as Leasing Intermediary
Since 1981, IIG had been in the business of developing equipment-leasing programs and placing equity investments therein for accredited investors. IIG was wholly owned by Straus. Thomas was IIG's primary leasing company. In fact, IIG rented from and shared office space with Thomas. Straus' brother-in-law was a one-third principal at Thomas, and all deals IIG undertook in 1983, except one, involved Thomas. As part of IIG's promotion of the sale-leaseback transaction, Straus prepared an "investment analysis" containing projected tax savings, economic return, and anticipated residual value of the equipment in 1991. The projections indicated that although the transaction would generate depreciation and interest deductions in the years 1983-87, it would turn around in years 1988-91 so that petitioners would actually pay $ 98,342 in additional taxes on anticipated rental revenue and equipment sale proceeds. Thus, according to Straus' projections, the leaseback generated no tax savings, assuming that petitioner retained the equipment throughout the term of the transaction, the equipment generated sufficient re-rental income, and *319 it had sufficient residual value. Straus' projections indicated that at the end of the lease the equipment would have a residual value of 10 percent of the IBM sale price or $ 90,045.30. Although a residual value calculation is not contained in the investment analysis, Straus testified that the 10-percent amount was based on his opinion of the value, residual values published by International Data Corporation (IDC), and information contained in an unspecified local daily marketing guide. Although he testified that IDC was engaged in the business of publishing residual expectations of equipment, the IDC publication relied upon was not produced. Straus also stated that the $ 90,045 represented 10 percent of the equipment's residual value at the end of 7 or 8 years. Straus calculated the 7- to 8-year period from the time of the December 1983 transaction, claiming that his reference books gave values for products as of January 1984 and forward. He made this assertion despite the fact that his calculations were made on or before December 10, 1983 (i.e., before January 1984), and despite the fact that the life expectancy for mainframe computer equipment is generally measured from *320 the time it is placed on the market. Straus' projections reflected increased cash-flow in years 1989-91. Although the projections themselves do not explain the source of the additional income, Straus testified that the increased cash-flow was expected to come from two sources: (1) Re-rental income; and (2) proceeds on the sale of the equipment in 1991. The major focus of any additional profit was on release of the equipment. According to his projections, equipment re-leasing would generate $ 70,333 and $ 138,864 of additional rental income in 1989 and 1990, respectively. Additionally, $ 159,477 in additional cash-flow was expected in 1991 from the balance of re-rentals and from the sale of equipment. [6]
*321 Straus testified that projected additional rental income was based on securing two additional renewals of the original leases. Anticipated re-leases were based on his assumption that the equipment had an economic life of 7 to 8 years, measured from the time of the 1983 sale-leaseback. Straus stated that as of the trial date, the rent-sharing period had commenced and that Chase and other end-users had been billed approximately $ 10,000 a month. Based on this income, Straus recently projected that petitioner would receive $ 130,000 in gross (i.e., before IIG fees) rental-sharing income in 1988-90. However, actual monthly rentals received from end-users have not exceeded $ 1,700, and not all equipment was leased at the time of trial. Moreover, at the time of trial, some equipment had value only for sale purposes and the lease market for such equipment was nominal. G. Petitioner's Investigation of the Sale-Leaseback Transaction
In all years at issue, petitioner was president and 50-percent shareholder in Calhoun Electric, an electrical contracting company. Petitioner was also a 50-percent managing partner in C&S Investments, a partnership involved in the purchase and leasing *322 of trucks, equipment, and real property to Calhoun Electric and other entities. Petitioner was responsible for investigating possible equipment purchases, negotiating an optimal purchase price, and arranging for the lease of the equipment. In this capacity, he generally compared items from several vendors, seeking the best possible price. Petitioners claimed wages from Calhoun Electric in 1983 and 1984 in the amounts of $ 287,047 and $ 236,991, respectively. In 1984, petitioners' interest in C&S Investments was valued at close to $ 2 million. In years 1983 and 1984, petitioners also invested in 12 to 13 limited partnerships, many of which were oil and gas ventures. Petitioner's financial planner, Vincent DeMartino, contacted IIG in June 1983, seeking on petitioner's behalf, information regarding a possible leasing program. Petitioner had known Mr. DeMartino and invested in transactions he promoted since 1979-80. IIG initially offered petitioner a $ 1 million leasing deal involving IBM computer processing (CPU) equipment. However, petitioner refused the deal. IIG subsequently provided petitioner with information on the Chase/Thomas transaction. While no prospectus or other *323 marketing information was available on this deal, IIG provided petitioner and his adviser with Mr. Straus' pro forma "investment analysis" showing projected tax savings, economic return, cash-flow, and residual value of the equipment at lease termination. Once petitioner showed sufficient interest in the transaction, he received a closing binder containing the purchase and lease agreements, promissory notes, bill of sale, and assignment of remarketing agreement for his execution as the purchaser. As an electrical contractor, petitioner occasionally wired IBM computers for some of his bank clients, but he otherwise had very little personal knowledge of computer equipment. Petitioner invested in the sale-leaseback because he thought the numbers were reasonable and he liked the reliability of Chase Manhattan Bank as lessee. Petitioner had general conversations with his daughter's college computer professor and a computer director at a client bank regarding the transaction. However, he did not otherwise thoroughly investigate the specifics of the deal. At the time he entered the leaseback transaction, he did not completely understand the relationships between the parties. Petitioner *324 was looking to Chase as the focus of the transaction and was unfamiliar with Thomas. At trial, he was unfamiliar with specific details about the lease between himself and Thomas, such as the deferral provision. Neither he nor his advisers investigated the financial soundness of IIG or Thomas. Petitioner did not verify the existence of the equipment. Likewise, he made no independent verification of the equipment's fair market value at the time of the transaction and no evidence was presented to show that this was done by his advisers. Other than reviewing the investment analysis provided by IIG with the college professor, his CPA, and his financial adviser, petitioner made no independent verification of the projections. No evidence was presented to show that the CPA or the financial adviser independently verified these projections. Petitioner did not personally investigate the transaction and claimed to have relied extensively on his CPA and on Vince DeMartino regarding the investment projections, for an overall investigation of the transaction, and for an understanding of the closing documents. However, although Mr. DeMartino promoted this and other transactions to petitioner *325 and still resided in the vicinity, he was not called as a witness for petitioner. Mr. Iverson, petitioner's CPA, prepared the returns for the years in issue. Petitioner testified that Mr. Iverson met twice with petitioner and Mr. DeMartino regarding the investment and the projections and spent 10 hours discussing the projections with petitioner. Petitioner testified that he definitely relied on his CPA in making the investment and that Mr. Iverson "felt it was an above-board deal and felt comfortable with it." However, like Mr. DeMartino, Mr. Iverson did not testify on petitioner's behalf. H. Expert Testimony Regarding Residual Value and Additional Rental Income
Petitioner called Ralph Page (Page) as an expert witness to testify regarding residual value and excess rental amounts. [7] Page was employed by Marshall and Stevens, a national appraisal company. He has degrees in business and law and is a certified senior member of the American Society of Appraisers. He has 14 years' experience appraising machinery and equipment, including 7 years of specialization in high-tech equipment. *326 In February 1989, Page prepared a retrospective appraisal and supplemental appraisal for the peripheral equipment at the request of petitioner's counsel. The report sought to determine the equipment's economically useful life and its fair market value as of the December 1983 purchase date. It also included estimates of residual value as of the December 1988 rent-sharing date and the December 1990 lease termination date. Page's report did not describe petitioner's equipment or its functions. At trial he generally described the functions of the equipment as follows: display stations or input terminals organize data and transmit it to a central processor; printers receive data from the central processing unit and display it visually on paper; control units function to route data between various units of the entire system. Page did not provide any information on the equipment's historical performance, its compatibility with other IBM equipment, or the current/future market conditions for such peripheral equipment. Page's report states that the purchase price paid by petitioner for the equipment was reasonable. However, he also concluded that the retail fair market value of the *327 equipment in December 1983 was $ 978,770.16, approximately $ 78,300 greater than the $ 900,453 listed on IBM invoices. While Page consulted the IBM invoices, he did not review any of the other purchase documents in making this determination. Instead, his determination was based on values for used equipment published in the October 1983 issue of Computer Price Guide, interpolated to account for model discrepancies, and adjusted (downward) to assume no features on the equipment. Additionally, Page's figure does not take into account the $ 70,463 in discounts from IBM. Considering discounts and Page's interpolations, we find that the fair market value of the equipment on December 15, 1983, was that amount listed on the IBM invoices or $ 900,453. Page projected a residual value of $ 117,452.42 or 13 percent of the IBM list price. In deriving residual values, Page utilized a trending technique, based on data developed by Marshall and Stevens, reflecting historically the cost of computer equipment over its useful life. His report utilized a 10-year useful life for the equipment. He defined this concept as "measuring the life of the equipment in terms of its technology and the obsolescence *328 of that technology and its viability in the used market." Page testified that the obsolescence factor for most computer equipment is measured from the date of its original market introduction. According to Page, peripheral equipment of the type under consideration was introduced into the market in approximately 1976. Page's report stated that peripheral equipment has enjoyed an economic useful life in excess of 10 years. He also testified that while IBM peripheral equipment has proved itself to have a useful life in excess of 14 years, most appraisers would conservatively use 10 years from date of introduction as a measurement of the economically useful life of such assets. However, in appraising petitioner's equipment, Page measured the 10-year period from the time of the transaction. Although his report does not contain a discussion of re-rental income, Page testified that he estimated additional rental income of $ 123,000 during the 1988-90 rent-sharing period. Page testified that application of an IDC rental formula resulted in a monthly rental amount of approximately $ 9,537 or $ 123,000 over the 2-year period, assuming: (1) That the present value of the rental stream at *329 the commencement of the rent-sharing period is equal to 90 percent of the residual value of the assets at that time; (2) a 24-month re-lease period; and (3) a 12-percent discount/interest rate. Neither the formula nor Page's excess rent calculation was included in his appraisal, and the IDC formula was not produced at trial. I. Tax Reporting and Notice of Deficiency
During the years at issue, petitioners' reported income and deductions from the computer equipment investment were as follows: Year
Rental income
Depreciation
Interest expense
Net loss
1983
-0-   $ 135,067.95
-0-   ($ 135,067.95)
1984
$ 161,635
$ 198,100.00
$ 77,272.00
($ 113,737.00)
Respondent disallowed the net losses based on his contentions that: (1) The sale and leaseback transaction lacked economic substance; (2) petitioner did not acquire the benefits and burdens of ownership in the equipment; (3) petitioner did not enter the transaction with an actual and honest profit objective; and (4) petitioner was not at risk with respect to the debt obligations he incurred in connection with the transaction. Respondent also determined additions to tax under sections 6653(a)(1) and (2) and *330 6661. He also determined increased interest under section 6621(c). OPINION I. Sham Transaction
The first issue for decision is whether petitioners' investment in the IBM peripheral computer equipment was a sham transaction devoid of economic substance. In general, a transaction has economic substance and therefore will be respected for Federal income tax purposes where there is a genuine multiple party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached. ; , affg. . That a transaction is shaped in part, however, by tax considerations is no reason for disregarding its form. ; . A sale and leaseback transaction involving computer equipment, for example, will be respected *331 if it is motivated by a "business purpose" and possesses "economic substance." ; , affd. in part and revd. in part . [8]
Examinations into the business purpose *332 and economic substance of transactions are inherently factual and petitioner bears the burden of proof. Rule 142(a); , affd. in part and revd. in part sub nom. . The business purpose inquiry focuses on the investor's subjective purpose for entering into the transaction at issue. ; . In the sale and leaseback context, the owner-investors who accrue tax benefits must show that they entered into the transaction motivated by a business purpose sufficient to justify the form of the transaction. ; . The economic inquiry analyzes objective factors indicating whether the transaction had a reasonable opportunity of producing a profit, exclusive of tax benefits. . A. Business Purpose
Petitioners assert that Mr. *333 Smoot entered the leasing transaction in order to diversify his equipment-leasing investments, to financially plan for his retirement, and to make a profit. However, based on our examination of the relevant facts and evidence in this case, we conclude that petitioners did not enter into the transaction for sound business reasons. . Petitioners' claim of business diversification is undercut by the fact that Mr. Smoot and his advisers failed to investigate critical aspects of the business decision to enter the transaction. . Neither petitioner nor his advisers performed a cost-benefit analysis of the IBM transaction. Neither petitioner nor his advisers verified the existence of the equipment, fair market value, residual value, or excess rental amounts. These things would have been done as a matter of routine by a prudent businessman investing close to $ 1 million to diversify his business. Moreover, petitioner's failure to investigate this venture stands in stark contrast to the comparisons and cost-benefit analysis he undertook when investing in equipment for his *334 leasing business. The failure to thoroughly verify the promised returns also cuts against petitioner's argument that this venture was undertaken to assure retirement funds. Had petitioner thoroughly analyzed the purchase documents, projected additional rental amounts, and residual value he would have discovered that rental income was questionable because Chase had no obligation to re-lease during the period between the end of the initial term and the 1988 rent-sharing date and the lag period required several re-leases before rent sharing commenced. An investigation, or appraisal, might also have revealed that the equipment's useful life would not extend until the end of the 7-year lease and an equipment sale in 1991 would not, therefore, generate retirement funds in excess of scrap value. Petitioner's profit indicia do not convince us that the leasing transaction was entered into for business reasons other than the generation of tax benefits. Petitioner's preclosing investigation, considering his other business experience, was casual and superficial, and investigative efforts by Mr. Smoot and his advisers fail to convince us of his profit objective. We find that petitioner paid *335 fair market value for the equipment as of December 1983. Therefore, we give no credence to petitioner's argument that his payment of less than fair market value for the equipment is an indication of profit objective. Petitioner also argues that the projections he reviewed as part of his preclosing investigation indicated that the leaseback would generate zero tax savings. Therefore, the fact that the transaction and preclosing documents did not stress tax savings indicates that the requisite profit objective was present. As discussed in connection with economic substance and the benefits and burdens of ownership, we find that the depreciation and interest deductions in the first 4 to 5 years of the transaction more than compensated petitioner for his investment (thereby creating a tax benefit) and that the nominal useful life of the equipment resulted in re-rental income or residual value insufficient to create the projected turnaround effect. Petitioner would have discovered this if he verified the residual values and the supplemental rent promised in the investment analysis or independently investigated the equipment and its useful life. Petitioner's demonstrated lack of information *336 and his failure to approach this investment in a businesslike manner convince us that the leaseback was not motivated by a sound business purpose sufficient to justify the form of the transaction. B. Economic Substance
The focus of our inquiry is to determine whether any realistic opportunity for economic profit existed, exclusive of the anticipated tax benefits. . Petitioner relies in part on expert testimony to establish the equipment's value in December 1983, the amount of anticipated rental income, and the residual value upon lease termination. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment, , and we may embrace or reject expert testimony, whichever, in our best judgment is appropriate. ; , affg. . Based on our analysis of the transaction, the evidence presented, and the weight accorded to *337 the expert testimony, we determine that the sale-leaseback transaction was not supported by economic substance. In order for petitioner to economically profit from the lease arrangement, the sum of the computer equipment's residual value and the supplemental rental income would have had to exceed $ 196,653, the amount by which petitioner's cash payment, short-term notes (including interest), and long-term debt payments exceeded cash-flow income and rental payments from Thomas. Petitioners have failed to prove that on December 15, 1983, residual value and supplemental rent could be expected to exceed that amount. C. Residual Value
Page's appraisal projected a $ 117,452.42 residual value or 13 percent of the equipment's list price. His value was derived using a trending technique based on the historic cost of the equipment over its useful life. Straus projected a 10-percent residual value of $ 90,045 derived from industry publications and based on his opinion of the equipment's residual value and economic life. Residual values of computer equipment depend on the age and type of equipment being evaluated. Because the physical qualities of a particular computer remain new *338 due to replacement of modular units under a maintenance contract, the technological age of the equipment is more important than its physical age; computer obsolescence is less a matter of physical deterioration than of technological innovation. Thus, valuation is based on the announcement and installation dates of the model, rather than on the manufacture date of the machine in question. , affd. without opinion . Because peripherals are generally more mechanical than they are electric, technological obsolescence is less rapid for peripherals than for processors. . [9] In general, peripheral terminal equipment (which includes control units, display stations, and printers), has the longest useful life of all peripheral equipment since the cost of terminal equipment represents mechanical functions which are not susceptible to dramatic technological improvement. . Certain terminal devices have commonly been used for 20 years or more. . *339 At trial, Page gave general descriptions of the terminal equipment purchased by Mr. Smoot. However, neither his testimony nor his report thoroughly addressed the function of this equipment, its price-performance since introduction, the history of the equipment's technology, or its compatibility with generations of other IBM equipment, all of which are necessary to finding a lengthy economically useful life. ; . Page, however, did state that a conservative estimate of this equipment's useful life would be 10 years and he acknowledged the general principle that such *340 useful life is measured from the date of introduction, which in this case was approximately 1976. See Contrary to his testimony, Page measured the 10-year useful life from the 1983 purchase date. Similarly, Straus also measured useful life from the time of the December 1983 transaction. He based his residual value and additional rental income projections on the fact that the equipment had a 7- to 8-year useful life measured from December 1983. Straus had no support for his use of a 7- to 8-year period other than his testimony that industry reference materials used such a number. Inconsistencies in determining the base year introduction date necessarily affect our conclusions regarding the residual value of the equipment. . Petitioners have failed to prove that the equipment had a useful life in excess of 10 years and that it should be measured from December 1983. Rule 142(a). Based on the evidence, we find that the equipment had a 10-year useful life measured from 1976. Consequently, we find that the equipment had only a 3-year useful life at the time *341 petitioner undertook the transaction in 1983, and it would have no remaining useful life at the end of the longest initial lease term (November 1986), the commencement of the 1988 rent-sharing date, or the 1991 equipment sale date. Therefore, we find that at the time of purchase, the equipment had no potential residual value and that a sale of the equipment in 1991 would not generate proceeds in excess of scrap value. D. Additional Rental Income
Page testified that he estimated additional rental income during the 1988-90 rent-sharing period to be $ 123,000. However, these rental income amounts were not documented in Page's appraisal report and were based on an unsubstantiated IDC formula. We do not rely upon them for our determination. According to Straus' investment analysis, petitioner could expect rents of $ 70,333 in 1989, $ 138,864 in 1990, and some amount in 1991. Straus' projected re-rental income was based upon a 7- to 8-year economic life for the equipment (measured from 1983) and the possibility of securing 2 additional re-leases of the equipment. Based on our finding regarding useful life, we conclude that the equipment would have no economic life after December *342 1986 and the potential for additional re-rentals in the last 2 years of the lease (December 1988 - December 1990) would be zero. Also, the possibility of additional rental income was questionable given that almost 60 percent of Chase's initial lease terms were for only 2 years. These terms ended in November 1985, 3 years short of the 1988 commencement in rent sharing. In order to generate rental income into and through the rent-sharing period, three additional leases would be required and petitioner would not rent share until the middle of the second additional lease. Given that Thomas was not obligated to re-lease the equipment until 1991 and Chase was not obligated to re-lease upon the expiration of the November 1985 and 1986 initial terms, the possibility that the equipment would stay on lease throughout the 7-year period and generate $ 209,197 in additional income was tenuous. Based on the lack of economic life and the questionable ability to keep the equipment on lease, we find that at the time petitioner entered the transaction, it was unlikely that additional rental income in 1988-90 or proceeds from the sale of the equipment in 1991 would exceed $ 196,653. Therefore, *343 we find that the sale-leaseback was without economic substance. Petitioners argue that the transaction had economic substance because it generated a negative cash-flow of only $ 167,485, [10] *344 and on the basis of Straus' investment analysis, they could reasonably have expected a $ 62,405 pretax profit, even accounting for IIG and Thomas' rent-sharing and remarketing fee percentages. [11] However, petitioner's calculations do not reflect that base rentals are only $ 127,843.88. Petitioner in fact acknowledges this amount on reply brief. Also, petitioner's $ 180,090 in cash down/short-term notes fails to include the interest paid on these notes which results in total payments of $ 205,649. Lastly, petitioner misrepresents the additional rent income for the 1989-90. Based on Straus' projections, total additional rent for the 1989-90 period was $ 209,197, [12] not, as petitioner would have us believe, $ 274,128. We are unclear how petitioner arrived at this number, but apparently he derived this number by relying exclusively on 1990 rental amounts less (incorrect) rental income from Thomas. Petitioner also provides similar calculations using Page's residual value and additional rental income amounts, claiming that the expert's estimation of pretax profit compares favorably with the $ 62,405 profit projected by Straus. However, as discussed above, we do not rely on Page's amounts and find this argument dissuasive. Although Straus *345 testified that IIG is billing $ 10,000 in monthly rentals, he also indicated that no more than $ 1,700 has been received in monthly rentals. Thus, the amount of additional rentals actually received does not support the projections relied upon by petitioner. Lastly, while Thomas and IIG may have had valid business reasons for structuring the transaction to include three parties, the business purpose test focuses on whether petitioner-investor's business purpose for entering the transaction was sufficient to justify its form. Based on a review of petitioner's subjective reasons for entering into the transaction and the objective factors indicating an opportunity for profit, we find that the sale-leaseback was not motivated by a business purpose and that it lacked economic substance. II. Benefits and Burdens of Ownership
Respondent argues that petitioners are not entitled to deductions attributable to the sale and leaseback transaction because Mr. Smoot did not acquire the benefits and burdens of ownership of the equipment. Whether the benefits and burdens of ownership have been transferred is an issue of fact to be decided according to the intentions of the contracting parties *346 as disclosed by their agreements, which are interpreted in light of all relevant facts and circumstances. . Petitioners bear the burden of proof. Rule 142(a). In , we pointed to eight factors relevant to determining whether a sale occurred. These factors are: (1) Whether legal title passed; (2) whether the parties treated the transaction as a sale; (3) whether the alleged purchaser acquired an equity in the property; (4) whether the contract of sale creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the purchaser is vested with the right of possession; (6) whether the purchaser pays property taxes following the transaction; (7) whether the purchaser bears the risk of loss or damage to the property; and (8) whether the purchaser receives profits from the operation and sale of the property. These factors are properly taken into consideration in sale-leaseback transactions. . *347 Certain of these factors are either irrelevant, neutral, or easily cast in a form favorable to a taxpayer. Through the use of a purchase agreement, recourse and nonrecourse notes, and a bill of sale, the parties treated the transaction as a sale, and legal title to the equipment passed between them. Of course, end-users were entitled to possession. Further, since net leases are common in such transactions, the fact that the lessee pays all property taxes and bears the risk of loss with respect to the equipment is a neutral factor. . The fact that the rental payments and debt service were substantially offsetting is also a neutral factor. . Whether a buyer-lessor has an equity interest in property is one of the most relevant factors from Grodt & McKay that can be applied to sale-leaseback transactions; it is the stuff of substance and only when it meshes with the form of the transaction does it constitute a sale. See , affg. . A taxpayer *348 without an equity in the property has no depreciable interest in the property, but rather has merely purchased tax benefits. See . Here petitioner has not proven that he had any equity in the equipment. As we stated in : The relevancy of equity, in a case where only nonrecourse debt is used in the purchase of property, [13] is that the presence or absence of equity is likely to determine whether the purchaser of the property continues to act like the owner of the property. In this case, however, the nonrecourse debt is effectively self-amortizing and whether Regency continues to act like the owner of the equipment throughout the term of the lease is likely to depend on whether contingent rent is being generated by the equipment and whether a significant residual value is expected to exist at the end of the leaseback term. * * * [Citation omitted.]
*349 Petitioners have failed to prove that contingent rent or residual value may be expected from the equipment, and because of our finding of a limited useful life, it seems that none is likely. Further, because of this short useful life and the extended period over which the long-term note is paid, there will come a point when valueless equipment will be the only security for a still unpaid note. In such a situation -- increasing disparity between the value of the asset and the unpaid note -- we have held that a taxpayer had no equity in the asset. [14]
However, the existence of taxpayer's equity is not singularly determinative. Other factors to which we may refer were set out in , and . These include: (1) The existence of useful life of the property *350 in excess of the leaseback term; (2) lease renewal or purchase options at the end of the lease term based on the fair market rent or fair market value of the equipment at that time; [15] (3) whether the projected residual value of the equipment plus cash-flow generated by the rental of the equipment allows the investors to recoup their investment in the property; (4) the taxpayer's equity interest as a percentage of purchase price; and (5) the expectation of a turnaround point at which time the investment would begin producing taxable income in excess of deductions in the later years of the lease with net tax benefits over the entire term of the lease less than the unrecovered cash investment.
Many of these factors overlap factors which we examined in determining whether the transaction has economic substance, such as useful life, renewal rental, and residual value. We have already found that the useful life of the equipment does not outlive the leaseback term. Since the *351 useful life will end before the rent-sharing period, there is no potential for additional rental income. Since the useful life will end before the leaseback expires, the value of the equipment at that time will be no more than scrap. Petitioner has proven that he expected to recoup only $ 9,000 out of a total $ 205,649 investment. He has not proven that he would make a profit from contingent rentals and residual value. The evidence on useful life makes it doubtful that petitioner would realize either. Therefore, there was no possibility that petitioner would recoup his investment or receive renewal rental at the end of the lease term. Petitioners argue that tax results projected over the 7-year period would cause them to pay additional taxes and would not result in net tax savings. Straus' investment analysis indicated that in years 1988-91, income would exceed deductions and by the end of the 7-year leaseback, petitioners would have paid $ 98,342 in taxes on the transaction. This projection, however, assumed that petitioner would remain in the leaseback throughout the life of the transaction and that there would be sufficient re-rental and residual value income to generate *352 a turnaround. We note that depreciation and interest deductions in the first 4 to 5 years of the transaction would more than compensate petitioner for his $ 205,649 cash investment. Also, given that the equipment was fully depreciated and would have been technologically obsolescent by 1987, it is unlikely that petitioner would have been able to rent it or remain in the deal beyond this point. Moreover, given the nominal useful life of the equipment, and, consequently, the lack of re-rental income or residual value, income from the transaction would be insufficient to create a turnaround effect. Without the turnaround, the transaction created only deductions which were in excess of petitioner's cash investment. We are mindful that petitioner made a cash investment representing 20 percent of the equipment cost. However, we find that this positive factor is greatly outweighed by what we regard as the negative factors surrounding the transaction. We, therefore, find that petitioner did not have the benefits and burdens of ownership of the equipment but merely acquired a right to minimal cash-flow and a future interest in the equipment that would become worthless when his interest *353 became possessory. Because petitioner did not acquire the benefits and burdens of ownership, he had no depreciable interest in the equipment and the 1983 and 1984 depreciation deductions were properly disallowed. The 1984 Interest Deduction
We also hold that respondent properly disallowed petitioner's 1984 interest deduction taken in connection with the equipment transaction. It is well settled that for interest to be deductible under section 163(a), the underlying indebtedness must be genuine. ; , affd. without published opinion . As we stated in , affd. without published opinion , "where * * * the purchase price and principal amount of the nonrecourse note unreasonably exceed the value of the property interest acquired it is settled that no genuine indebtedness exists." (Fn. ref. omitted.) Since petitioner did not acquire the benefits and burdens of ownership, any property interest which *354 he acquired could not have been a fee simple interest in the equipment. Rather, we think that petitioner's cash investment "was clearly paid for the right to participate in the contingent benefits hopefully to be derived from the future use of the equipment at a point of time when that use was at best speculative." . Under our findings, petitioner would not realize any contingent rent or residual value; therefore, the property interest which he purchased would have been no more than a right to participate in minimal cash-flow. The nonrecourse note was greatly in excess of the fair market value of this right; therefore it does not constitute genuine debt, and interest deductions with respect thereto were properly disallowed. Petitioner is, however, entitled to deduct interest on the short-term notes actually paid in 1984 in accordance with the opinion of the Court of Appeals in . See , affd. . Because of the foregoing, we *355 need not decide whether the transaction was an activity engaged in for profit or whether deductions with respect to the transaction were limited by section 183. Neither do we need to discuss the applicability of the at-risk provisions of section 465. III. Additions to Tax and Increased Interest
Respondent determined additions to tax against petitioners under sections 6653(a)(1) and (2) and 6661. Increased interest was also determined pursuant to section 6621(c). The burden of proof is on petitioners to show they are not liable for these additions and increased interest. ; Rule 142(a). Section 6653(a)(1) provides for an addition to tax if any part of an underpayment is due to negligence or the intentional disregard of rules or regulations. Section 6653(a)(2) imposes an additional amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that they were not negligent. . "Negligence" includes any failure *356 to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. , revg. . Petitioners assert that they were not negligent within the meaning of section 6653(a) because they regularly sought the advice of their CPA who prepared the return, the leasing deductions were claimed in good faith and in the honest belief that the amounts were deductible, and all pertinent information was fully revealed on their return. The mere fact that petitioners used a professional return preparer does not without more insulate them from the section 6653(a) additions to tax. ; . They must show that the advice of the professional was based on all the facts. , affg. . [16] Although he prepared petitioners' returns for the years at issue, *357 Mr. Iverson did not testify at trial. Other than petitioner's self-serving statements that he showed his CPA the projections and discussed them for hours and that his CPA met twice with petitioner and Mr. DeMartino, there is no evidence that the CPA was otherwise aware of the facts and circumstances of the deductions or that he advised petitioners with respect to claiming them in 1983 and 1984. Although petitioners may have believed that the computer-related expenses were deductible, cases decided in years 1983 and 1984 indicated to the Smoots and their advisers that the computer-leasing transaction might be treated as a sham. In fact, petitioner's purchase agreement with IIG required him to warrant that he independently investigated the transaction and was aware that respondent had not yet passed upon its validity. These circumstances and the fact that petitioners invested close to $ 1 million in the transaction underscored the need *358 for a thorough and adequate investigation by petitioner and his financial adviser/CPA. We find that the failure to appraise the equipment, verify the projections, and evaluate the useful life constitutes negligence within the meaning of section 6653(a). This case is distinguishable from Here petitioners were upper-income, sophisticated investors who invested in 13 other ventures besides the one at issue. Mr. Smoot was also the managing partner of an equipment-leasing partnership and was responsible for investigating equipment purchases. While proof that petitioner pored over every word in the purchase documents is not necessary, we note that proof that he understood the relationship of the parties and the structure of the transaction is lacking here. Credible evidence that petitioner was thoroughly advised by Mr. DeMartino or Mr. Iverson is also lacking, since neither adviser testified on petitioner's behalf. No evidence was presented to show that petitioners monitored or were otherwise involved with the investment. On the basis of the foregoing, we find that petitioners have failed to prove that they are not liable for *359 the section 6653(a) additions to tax. Petitioners presented no evidence regarding application of sections 6661 or 6621(c). Since petitioners failed to carry their burden of proof with respect to section 6661, respondent's determination will be upheld. Since we find the sale-leaseback to be without economic substance, we also hold for respondent with respect to the section 6621(c) increased interest. , affd. , affd. without published opinion sub nom. , affd. sub nom. , affd. sub nom. . To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue, and all Rule references are to the Tax Court's Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment attributable to negligence.↩
**. 120 percent of the interest due on any substantial underpayment attributable to a tax-motivated transaction.↩
2. Used in the singular, "petitioner" refers to Norman L. Smoot.↩
3. Peripheral equipment feeds information into and out of the central processing unit. The central processing unit, sometimes referred to as mainframe equipment, actually performs the data processing functions.↩
4. According to the parties, petitioner executed his purchase documents on Dec. 15 and airfreighted them from Texas to New York where they were signed by IIG on Dec. 16. Although the parties intended the sale from IIG to petitioner to occur simultaneously with the sale from Thomas to IIG, apparently it was necessary for petitioner's transaction to occur first since IIG paid Thomas with cash from its sale to petitioner.↩
5. This amount is calculated as follows: ↩
Base rental income from Thomas
$ 1,127,840 Less: P's debt service on long-term note
(1,118,844)
Total positive cash-flow
8,996 Less: cash payments plus interest
(205,649)
Total          ($ 196,653)
6. These amounts are derived as follows: Year
Rent/Resid. income
-
Debt service
=
Free cash
1989
$ 230,167
-
$ 159,834
=
$ 70,333 1990
298,698
-
159,834
=
138,864
1991
239,394
-
79,917
=
159,477
These amounts do not reflect IIG's 10-percent collection fee, Thomas' rent-sharing percentages, or Thomas' 10-percent remarketing fee on 1991 sale proceeds.↩
7. Respondent did not call an expert witness.↩
8. But see , affg. , , , and affg. and rev'g. in part (rigid two-step analysis not required; business purpose and economic substance are two of several factors considered in undertaking the sham transaction analysis). See also , affg. .↩
9. See also ; , affd. ; , affd. .↩
10. This calculation is as follows: ↩
Total base rentals  $ 1,131,443 Less: long-term debt  (1,118,838)
Less: total short-term notes  (180,090)
Total
(167,485)
11. This amount is determined as follows: Total additional rent for 1989 and 1990 -  ($ 11,422 X 24)    $ 274,128 Less: rent sharing percentage (80-50 percent)  (125,278)
Net additional rental income    $ 148,850 Add: resid. val. less 10 percent remarketing fee  81,040 Total additional rent and residual value  $ 229,890 Less: negative cash-flow  (167,485)
Total net profit  $ 62,405 On reply brief, petitioners assert that a $ 33,240.97 profit would exist even if the Court finds that there is a negative cash-flow of $ 196,649. ($ 229,890 - 196,649.03 = $ 33,240.97)↩
12. ↩
Rent/resid. income
-
Income from Thomas
=
Excess rental
230,167
-
159,834
=
70,333
298,698
-
159,834
=
138,864
Total 209,197
13. , did not involve the use of nonrecourse debt only, as a 12-percent downpayment was made on the equipment bought and leased in that transaction.↩
14. ; .↩
15. In petitioners' case, there are neither.↩
16. See also .↩