Thomas C. **RINK** and Alison W. **Rink**, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent–Appellee.

No. 93–2362.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 29, 1994.

Decided Feb. 16, 1995.

Charles G. Atkins (briefed), Thomas C. Rink (argued and briefed), Strauss & Troy, Cincinnati, OH, for petitioners-appellants.

Ann Belanger Durney, Alice L. Ronk (argued), Gary R. Allen, Acting Chief (briefed), U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, DC, James D. Hill, Cincinnati, OH, for respondent-appellee.

Before: MILBURN and SUHRHEINRICH, Circuit Judges; and JOINER, District Judge.*

SUHRHEINRICH, Circuit Judge.

This appeal presents two issues: 1) whether the tax court's interpretation of the Closing Agreement entered by taxpayers and the Internal Revenue Service ("IRS") was erroneous; and 2) whether the tax court erred in finding that a 1986 lease was without substance for tax purposes.[1] For the reasons that follow, we **AFFIRM.**

### I.

The relevant facts to this appeal are as follows. Petitioner, Thomas C. Rink, ("Rink" or "taxpayer") a tax attorney, began advising Moore, Owen, Thomas & Co. ("Moore"), an equipment leasing company on tax matters in 1980. On December 30, 1980, Rink purchased three lawn service trucks from

---

* The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Alison Rink, Thomas Rink's wife, is a party to this action solely by virtue of the fact that Thomas C. Rink filed a joint return with her for the tax year 1986.

Moore. The three trucks were subject to a prior lease ("1980 Lease"), running from November 14, 1980, through December 31, 1988, between Moore, as lessor and Chemlawn Corporation ("Chemlawn"), as lessee. Rink assumed a zero salvage value for the trucks and claimed depreciation deductions that exhausted the full basis over the course of the taxable years 1980, 1981, 1982 and 1983. Several other investors, including Charles Atkins ("Atkins") purchased lawn service trucks from Moore and calculated depreciation based upon a zero salvage value estimate.

The IRS issued notices of deficiency to Rink and the other investors after determining that the trucks they owned had a substantially greater salvage value. Rink challenged the determination before the tax court in 1986 on behalf of himself and another investor, Charles Atkins. In December 1986, Rink and Sherri L. Feuer ("Feuer"), an attorney for the IRS, began negotiating a settlement for Atkins which was to include a closing agreement regarding allowable depreciation deductions on Atkins' trucks. The parties were unable to reach agreement, and the draft was never executed.

On December 31, 1986, Atkins and Rink executed "master vehicle leases" ("1986 Lease") with Moore. Under the 1986 Leases, Moore purported to lease Atkins' and Rink's trucks for a period of forty-eight months beginning January 1989. Interestingly, Rink neglected to inform Feuer of the execution of these leases. At oral argument, Rink admitted that he purposely failed to inform Feuer of the execution of these leases.[2]

Subsequent to the execution of the 1986 Leases, taxpayer issued a letter to Feuer, dated January 26, 1987, informing the IRS that Atkins wished to accept the settlement offer, provided that "if and when his equipment is released, he will again be able to readjust his salvage value account." Feuer agreed that the salvage value could be rede-

termined if Atkins renegotiated a lease, but asserted that the IRS would not agree to a future salvage value because the value would be dependent on the facts and the circumstances of the particular transaction. During the settlement negotiations, Rink made several suggestions concerning the terms of the closing agreement relating to calculating the salvage value upon a renegotiated lease of the trucks. Throughout the negotiations, he failed to inform Feuer of the 1986 Lease agreements between Rink and Moore, or the similar agreement between Atkins and Moore.

Thomas Rink and his wife, Alison Rink, filed a joint federal income tax return for the taxable year 1986, claiming a $24,990 deduction for "Chemlawn CLADR Salvage Value Adjustment," which represented the depreciation on Rink's three trucks. These trucks had been fully depreciated on his tax returns for prior years (the depreciation deductions that were the subject of the settlement negotiations between Rink and Feuer at the time the 1986 return was filed). The Rinks had not executed the Closing Agreement with Feuer relating to the salvage value of the trucks or as to allowable depreciation deductions for prior taxable years.

After lengthy negotiations, Atkins signed a Form 906 Closing Agreement covering allowable depreciation deductions on his trucks. The Rinks also signed a Form 906 Closing Agreement ("Closing Agreement" or "Agreement") covering depreciation on their three trucks. As mentioned above, Rink purposely concealed the existence of the 1986 Lease both when his client executed his Form 906 Closing Agreement and again when Rink executed his own Form 906 Closing Agreement. Presumably, Rink decided to conceal the 1986 Lease in an attempt to circumvent the effect of the Closing Agreement and further his own hidden agenda.

Section 167 of the Internal Revenue Code authorizes taxpayers to deduct a reasonable

---

**2.** Rink also indicated that failing to notify the IRS of this material information during negotiations for the Closing Agreement, in his view, presented no ethical concerns and that the nondisclosure was justified on the basis of client confidentiality. This court is amazed that any-

one can even suggest that the failure to inform another party of material information during contract negotiations is scrupulous or characteristic of the conduct demanded of officers of the court.

allowance for the exhaustion, wear and tear of property used in trade or business or held for the production of income. *See* 26 U.S.C. § 167. The Closing Agreement negotiated on behalf of the Rinks addressed the amount of depreciation deductions allowable in connection with their purchase and subsequent lease of the three trucks. Specifically, the Agreement concerned allowable losses resulting solely from depreciation from November 14, 1980 through December 31, 1988. The Agreement provided in relevant part that:

> taxpayers are entitled to no additional losses or deductions for depreciation with regard to the above transaction, except as set forth in paragraph 2 above, with the exception that if the taxpayers renegotiate a lease with the Chemlawn Corporation or any other third party, then salvage may be redetermined at that time.

(Closing Agreement at ¶ 3.)

On December 28, 1988, Rink and Moore executed another lease, effective October 1, 1988 ("1988 Lease"). The 1988 Lease references the original 1980 Moore/Chemlawn lease as the lease under which the taxpayer's trucks currently were being leased. The 1988 Lease also stated that the 1980 Lease was terminated effective September 30, 1988. No mention was made of the existence or cancellation of the 1986 Lease. Subsequently, in October 1988, Moore executed a lease agreement with Chemlawn to sublease Rink's trucks.

## II.

 On review, we will not overrule a tax court's factual determination unless we find them to be clearly erroneous. *Bryant v. Commissioner*, 928 F.2d 745, 748 (6th Cir. 1991). Thus, the district court's findings will be upheld unless we are left with the firm conviction that a mistake has been made. *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Questions of law are reviewed de novo. *Bryant*, 928 F.2d at 748.

---

**3.** Accordingly, we decline to review the extrinsic evidence offered by the parties because we con-

## III.

This action involves a claimed federal income tax deficiency for the tax years 1985 and 1986. The 1985 deficiency is solely a computation issue; its resolution is determined by the proper tax amount for 1986. The deficiency arises from Rink's deduction based on an adjustment in the salvage value of three commercial trucks. The adjustment was calculated under the terms of a Form 906 Closing Agreement executed by the Rinks and the Commissioner of Internal Revenue. The Closing Agreement covered the amount of depreciation deductions that taxpayers would be allowed to claim on their purchase of three lawn service trucks which they leased to third-parties.

Rink raises two issues on appeal: 1) whether the tax court erred by finding that Paragraph 3 of the Closing Agreement operates prospectively as of the date of execution; and 2) whether the tax court erred in finding that the 1986 lease of appellant's trucks was without substance.

### A.

 A closing agreement is a contract, and generally is interpreted under ordinary contract principles. *See, e.g., Smith v. United States*, 850 F.2d 242, 245 (5th Cir.1988); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir.1984). Thus, if the essential terms of an agreement are deemed unambiguous, a court will not look beyond the four corners of the document to determine the parties' intent. *Id.* An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.

 Resolution of the first issue raised on appeal requires us to interpret the October 16, 1987 closing agreement executed by Thomas C. Rink and Alison W. Rink and the IRS. The parties agree that the closing agreement is clear and unambiguous. They disagree, however, with respect to the proper interpretation of the agreement. We find that the closing agreement is clear and unambiguous.[3]

---

clude that the agreement is unambiguous, and

Both sides argue the syntactical and grammatical meaning to be given the phrase "if the taxpayers renegotiate a lease .... then the salvage value may be redetermined at that time." (Closing Agreement at ¶ 3.)[4] Rink's attempt to contort this language to his benefit fails in its entirety, as he would have this court ignore the plain meaning assigned to the words "if" and "then" to somehow refer to events that have already occurred, rather than refer to a future or prospective event. The plain and simple reading of the Agreement indicates that paragraph 3 is prospective and contemplates only a lease renegotiated after the execution of the agreement. Any other interpretation would make little sense and would effectively negate the stated purpose of the agreement.

### B.

■ Rink's final argument on appeal is equally unavailing. We find absolutely no error in the tax court's finding that the 1986 Lease lacked economic substance for tax purposes.

■ The court engages in a two-part inquiry to determine whether an asserted deduction is valid. The threshold question is whether the transaction has economic substance. *Pasternak v. Commissioner,* 990 F.2d 893, 898 (6th Cir.1993). The court does not make the second inquiry, i.e., whether the taxpayer was motivated primarily by profit unless it determines that the transaction is not a sham. *Id.; Mahoney v. Commissioner,* 808 F.2d 1219, 1220 (6th Cir. 1987).

■ The test for whether a transaction is a sham is "whether the transaction has any practicable economic effects other than the creation of income tax losses." *Pasternak,* 990 F.2d at 898 (citing *Mahoney,* 808 F.2d at 1220). The tax court's findings of fact on this issue are reviewed under a clearly erroneous standard. *Id.* This circuit holds that

"[i]f [the transaction] is a sham, then such niceties as whether it was 'primarily' for profit, or whether the test is an objective or subjective one are simply not involved." *Mahoney,* 808 F.2d at 1220. Accordingly, if the court determines that the transaction is a sham, the entire transaction is disallowed for federal income tax purposes.

Here, as in *Mahoney,* the tax court decided that the 1986 Lease transaction was a sham, making it unnecessary to determine whether the lease was entered primarily for profit. *Mahoney,* 808 F.2d at 1220. Accordingly, we likewise limit our analysis. Therefore, Rink's assertion that the lease provided a guaranteed profit of over $20,000 in present value is irrelevant for purpose of our review.

Further, Rink's assertion that the tax court was limited to a review of the 1986 Lease is simply not supported by this circuit's precedent. The *Mahoney* court authorizes a court to "look[ ] to the whole scenario .... [including] the overview of the entire course of dealings." *Id.* at 1220.

Upon careful and studied review of the record, this court finds that considerable evidence supports the tax court's conclusion that the 1986 Lease was a sham. The tax court, viewing the whole scenario, concluded that the 1986 Lease was "designed solely to allow for the earliest possible deduction of whatever undepreciated basis Mr. Rink would have in the trucks after settling the depreciation issue for prior years." *Rink v. Commissioner,* 100 T.C. 319, 331, 1993 WL 101372 (1993). We agree.

A comparison of the 1980 and 1988 Leases with the intervening 1986 Lease illustrate that the 1986 Lease was nothing more than a tax maneuver. Neither the 1980 Lease nor the 1988 Lease were individually tailored to Rink. Rather, they were uniform agreements, designed to address Moore's rental of all trucks, including Rink's and the other investors' trucks. It is clear that the objective of both the 1980 and 1988 Lease was to

therefore, do not need to look beyond the four corners of the document.

4. The final paragraph provides:
taxpayers are entitled to no additional losses or deductions for depreciation with regard to the

above transaction, except as set forth in paragraph 2 above, with the exception that if the taxpayers renegotiate a lease with the Chemlawn Corporation or any other third party, then salvage value can be redetermined at that time.

treat the trucks as a fleet. By contrast, the intervening 1986 Lease was individually tailored to Rink. Additionally, we note that the parties never performed under the 1986 Lease. In fact, the 1986 Lease was displaced prior to its effective date by the 1988 Lease. Furthermore, the 1988 Lease never mentioned the existence of the 1986 Lease, there was no novation of the 1986 Lease, nor was the 1986 Lease revoked or terminated by the 1988 Lease. The 1988 Lease did, however, identify the 1980 Lease as the agreement under which Rink's trucks were being leased (not the 1986 Lease) and expressly state that the current 1980 Lease was terminated pursuant to the terms of the 1988 Lease. In sum, all the evidence indicates that the 1986 Lease was nothing more than a tax maneuver.

On the state of the record before us, we cannot say that the tax court's credibility determinations and factual findings were clearly erroneous. Accordingly, we affirm the tax court's finding that the 1986 Lease lacked economic substance for tax purposes.

## IV.

For the reasons provided above, we **AFFIRM** the decision of the tax court.