RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THE DOW CHEMICAL COMPANY,

*Plaintiff-Appellee,*

v.

No. 03-2360

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 00-10331—David M. Lawson, District Judge.

Argued: June 3, 2005

Decided and Filed: January 23, 2006

Before: RYAN, MOORE, and COOK, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Dennis M. Donohue, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. John B. Magee, McKEE NELSON LLP, Washington, D.C., for Appellee. **ON BRIEF:** Dennis M. Donohue, Richard Farber, Gilbert S. Rothenberg, Robert W. Metzler, James D. Hill, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. John B. Magee, Gerald Goldman, Raj Madan, Richard C. Stark, Sheri A. Dillon, McKEE NELSON LLP, Washington, D.C., for Appellee.

MOORE, J., delivered the opinion of the court, in which COOK, J., joined. RYAN, J. (pp. 11-16), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. In 1988 and 1991, Plaintiff-Appellee The Dow Chemical Company ("Dow") purchased corporate-owned life insurance ("COLI") policies on the lives of thousands of its employees. In the taxable years 1989 to 1991, Dow claimed deductions for interest incurred on loans used to pay the COLI premiums and for fees related to the administration of the policies. The Internal Revenue Service ("IRS") disallowed these deductions and assessed tax deficiencies and interest, which Dow paid under protest and attempted to recover by suing for a refund. Following a bench trial, the district court ruled that the IRS had improperly disallowed the deductions and ordered judgment in Dow's favor.

1

Because the COLI plans were economic shams and the deductions therefore were properly disallowed, we **REVERSE** the district court's judgment and remand for entry of judgment in favor of the United States.

# I.  BACKGROUND

## A.  Factual Background

The district court conducted a bench trial lasting over two months, heard testimony from twenty-six witnesses, and received 1,526 exhibits and numerous factual stipulations.  The facts of the case and the parties' arguments are discussed at length in the district court's two thorough opinions.  *Dow Chem. Co. v. United States* (*Dow I*), 250 F. Supp. 2d 748 (E.D. Mich. 2003); *Dow Chem. Co. v. United States* (*Dow II*), 278 F. Supp. 2d 844 (E.D. Mich. 2003).  Because the case turns not on factual disputes but on issues of law, we present here only a brief factual background.

In 1988, Dow purchased COLI policies on the lives of 4,051 employees from Great West Life Assurance Company ("Great West").  In 1991, Dow purchased COLI policies on the lives of 17,061 employees from Metropolitan Life Insurance Company ("MetLife").  Dow, which was both the owner and the beneficiary of these policies, paid the premiums through two primary funding mechanisms.

First, Dow borrowed money from the insurers, using the cash values of the policies as collateral.[1]  These policy loans were the principal source of funding during the first, second, third, eighth, and ninth years of the Great West plan and during the first three years of the MetLife plan.  For example, Dow paid (i) Great West's first-year premium of $40,582,000 using $38,866,000 in proceeds from the policy loan and $1,717,000 of its own cash[2] and (ii) MetLife's first-year premium of $170,510,000 using $158,756,000 in proceeds from the policy loan and $11,754,000 of its own cash.

Second, Dow made partial withdrawals from the unencumbered cash values of the policies (i.e., the value not already used as collateral for a policy loan).[3]  Partial withdrawals were the principal source of funding during the fourth through seventh and tenth through thirteenth years of the Great West plan and during the fourth through eighth years of the MetLife plan.  For example, Dow paid (i) Great West's fourth-year premium of $40,360,000 (plus $11,278,000 in interest accrued on the policy loans) using $45,149,000 in proceeds from the partial withdrawals and $6,489,000 of its own cash and (ii) MetLife's fourth-year premium of $169,770,000 (plus $38,132,000 in interest) using $195,779,000 in proceeds from partial withdrawals and $12,123,000 of its own cash.[4]

---

[1]The policy-loan transactions were structured as follows:  "Dow would receive a bill from the insurance company that netted the premium and interest charges against the proceeds of a loan that was made on the first day of the policy year, leaving a relatively small balance to pay in cash.  The premium payment created value in the policy, which was used as security for repayment of the loan."  *Dow I*, 250 F. Supp. 2d at 812.

[2]Where, as here, the component figures to be summed do not add to the stated total, it is due to rounding.

[3]These partial-withdrawal transactions were structured as follows:  "(1) the gross premium was deemed paid; (2) the deemed payment of the premium created cash value; (3) Dow made a partial withdrawal of the cash value; and (4) the partial withdrawal was used to offset approximately 90% of the premium and accrued loan interest."  *Dow I*, 250 F. Supp. 2d at 814.  Under each plan these steps were carried out effectively simultaneously.

[4]During the tenth through thirteenth years of the Great West plan, dividends from the policies were another source of funding.  For example, Dow paid the tenth year's premium of $3,702,000 (plus $14,442,000 in interest accrued on the policy loans) using $12,343,000 in proceeds from the partial withdrawals, $3,685,000 in policy dividends, and

All told, from 1988 to 2000, Dow paid $377,062,000 in premiums and $131,986,000 in interest to Great West from the following sources: $201,317,000 in policy loans, $238,844,000 in partial withdrawals, $9,203,000 in policy dividends, and $59,679,000 (about 16% of the premiums) in cash. From 1991 to 1998, Dow paid $849,890,000 in premiums and $239,371,000 in interest to MetLife from the following sources: $509,574,000 in policy loans, $495,844,000 in partial withdrawals, and $83,844,000 (about 10% of the premiums) in cash.

In addition to the payment mechanisms described above, both COLI plans shared several other pertinent characteristics. First, both plans were projected to generate negative pre-deduction (i.e., without taking into account the benefit of income-tax deductions) cash flows for many years — eighteen and seventeen years for the Great West and MetLife plans, respectively — before eventually generating positive cash flows contingent on the infusion of large amounts of cash by Dow. The net present value ("NPV") of these cash flows was either positive or negative, depending on the discount rate used in the analysis. Second, neither plan was projected to experience significant inside build-up (i.e., the accrual of interest on the value of the policies) in the short term, because any such value would either be stripped from the policies (through the partial withdrawals) or encumbered (though the loans against the policies). If Dow injected large sums of cash into the policies, however, the plans would accrue significant interest in the long term. Third, both plans limited Dow's potential mortality gain (i.e., the receipt of greater-than-expected death benefits due to a greater-than-expected number of deaths among the covered employees): Great West could recover its mortality losses through rate adjustments, while MetLife could assess charges to recoup its mortality losses.

In the taxable years 1989 to 1991, Dow claimed deductions totaling $33,004,360 for interest paid on loans used to pay the COLI premiums and for fees related to the administration of the policies.[5] The IRS disallowed these deductions and assessed tax deficiencies and interest totaling $22,209,570.[6] Dow paid this amount and filed administrative protests that the IRS denied.

## B. Procedural Background

Dow filed suit in the district court to recover by refund the sum it had paid under protest, plus interest. The government argued that Dow's deductions were improper because the COLI plans were economic shams. Following a bench trial, the district court ruled that the IRS had improperly disallowed the deductions because the COLI plans were not economic shams and consequently ordered judgment in Dow's favor. The government appeals this conclusion and two subsidiary rulings. First, the district court credited the discount rate (and concomitant NPV) offered by Dow rather than the one offered by the government. Second, the district court excluded projections of the COLI plans' performance that Dow had submitted with its administrative protests because they were statements made in settlement negotiations under Rule 408 of the Federal Rules of Evidence.[7]

---

$2,116,000 in its own cash. Dow did not use policy dividends to make any payments to MetLife.

[5] In taxable years 1989, 1990, and 1991, Dow claimed deductions for (i) interest expenses of $3,843,813, $12,968,778, and $13,491,825, respectively, and (ii) administrative fees of $168,563, $2,175,160, and $356,221, respectively.

[6] For taxable years 1989, 1990, and 1991, the IRS assessed (i) tax deficiencies in the amount of $1,367,386, $3,043,326, and $6,836,910, respectively, and (ii) interest in the amount of $1,781,778, $3,235,630, and $5,944,540, respectively.

[7] Other aspects of the district court's opinion were not appealed and therefore are not discussed here.

## II. ANALYSIS

### A. General Principles

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). In the instant case, Dow attempted to decrease its tax liability principally through I.R.C. § 163(a) (26 U.S.C. § 163(a)), which permits a taxpayer to deduct "all interest paid or accrued within the taxable year on indebtedness." For life insurance contracts, the deduction of interest on indebtedness is circumscribed:

> No deduction shall be allowed for . . . any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance . . . contract . . . pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract . . . .

I.R.C. § 264(a)(3). This prohibition does not apply "if no part of 4 of the annual premiums due during the 7-year period (beginning with the date the first premium on the contract to which such plan relates was paid) is paid under such plan by means of indebtedness." I.R.C. § 264(d)(1). Even under this safe-harbor, however, the Code provision in effect when the instant plans were purchased (1988 and 1991) limited the deduction to $50,000 of indebtedness per insured life. I.R.C. § 264(a)(4) (1988).

Of course, a taxpayer is not automatically entitled to every claimed deduction. "[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992). Moreover, even if a transaction is in "formal compliance with Code provisions," a deduction will be disallowed if the transaction is an economic sham. *Am. Elec. Power Co.* (*AEP*) *v. United States*, 326 F.3d 737, 741 (6th Cir. 2003), *cert. denied*, 540 U.S. 1104 (2004). "The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses." *Rose v. Comm'r*, 868 F.3d 851, 853 (6th Cir. 1989). If the transaction has economic substance, "the question becomes whether the taxpayer was motivated by profit to participate in the transaction." *Illes v. Comm'r*, 982 F.2d 163, 165 (6th Cir. 1992), *cert. denied*, 507 U.S. 984 (1993). "If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for federal tax purposes, and the [subjective] inquiry is never made." *Id.*; *see also Rose*, 868 F.3d at 853 ("This court will not inquire into whether a transaction's primary objective was for the production of income or to make a profit, until it determines that the transaction is bona fide and not a sham.").

### B. Standard of Review

In conducting the economic-sham inquiry, the district court's findings of fact are reviewed for clear error. *AEP*, 326 F.3d at 741 (citing *Rink v. Comm'r*, 47 F.3d 168, 172 (6th Cir. 1995)). The district court's ultimate conclusion that a transaction is or is not an economic sham is reviewed de novo.[8] *Id.* at 742.

---

[8] A panel of this court once noted in an economic-sham case that "[w]here the judgment below is ultimately a finding of fact, it is well-settled that the determination of the Tax Court is binding on the appellate court unless clearly erroneous." *Ratliff v. Comm'r*, 865 F.2d 97, 98 (6th Cir. 1989) (alteration in original) (internal quotation marks omitted). Two decisions issued mere months after *Ratliff* clarified that while the factual findings underlying a sham determination are reviewed for clear error, the legal standards employed and the ultimate conclusion are reviewed de novo. *Kennedy v. Comm'r*, 876 F.2d 1251, 1254 (6th Cir. 1989); *Rose*, 868 F.2d at 853. Since this trio of decisions in 1989, we have consistently followed the more nuanced formulation of *Kennedy* and *Rose* whenever we have explicitly stated the standard of review. *AEP*, 326 F.3d at 741-42; *Rink*, 47 F.3d at 171; *Smith v. Comm'r*, 937 F.2d 1089, 1096 (6th Cir.

## C. Economic Substance of Dow's COLI Plans

Several courts, including this one, have addressed the economic substance of COLI plans, finding the plan to be a sham on each occasion. *Id.* at 744; *IRS v. CM Holdings, Inc.* (*In re CM Holdings, Inc.*), 301 F.3d 96, 102-03 (3d Cir. 2002); *Winn-Dixie Stores, Inc. v. Comm'r* (*Winn-Dixie*), 254 F.3d 1313, 1317 (11th Cir. 2001), *cert. denied*, 535 U.S. 986 (2002). These courts have looked to several indicators of the COLI plans' potential economic benefits: (i) projected pre-deduction cash flows, "'[(ii)] mortality gains to the beneficiary, who does not pay tax on proceeds, and [(iii)] interest-free inside build-up [the accrual of interest on the policy value].'" *AEP*, 326 F.3d at 742 (last alteration in original) (quoting *CM Holdings*, 301 F.3d at 103). We examine the objective economic substance of Dow's COLI plans against each of these standards below.

### 1. Pre-Deduction Cash Flows

In each prior case addressing the economic substance of a COLI plan, the court found that, without the benefit of the claimed interest deductions, the plan generated negative cash flows. *AEP*, 326 F.3d at 742; *CM Holdings*, 301 F.3d at 103; *Winn-Dixie*, 254 F.3d at 1316. Indeed, we have called a COLI plan's negative pre-deduction cash flows (that become positive when the benefit of interest deductions is considered) a "hallmark[] of an economic sham." *AEP*, 326 F.3d at 742.

The district court found that the Great West and MetLife plans would generate negative pre-deduction cash flows during their first eighteen and seventeen years, respectively. Unlike the COLI plans in *AEP*, *CM Holdings*, and *Winn-Dixie*, however, Dow's plans were not projected to be cash-flow negative for their entire durations. The district court found that Dow intended to infuse large sums of cash into the plans during their middle years,[9] which would make the plans cash-flow positive in their later years. Because the plans were projected to have both cash-flow-negative and cash-flow-positive years, the district court applied a NPV analysis to determine the overall cash flow.[10] Finally, the district court credited the discount rate utilized by Dow's experts and found that the NPV of each plan was positive.

---

1991); *Bryant v. Comm'r*, 928 F.2d 745, 748 (6th Cir. 1991). Although there may appear to be some tension between *Ratliff* and our subsequent cases, we recognized in *AEP* that the *Ratliff* panel "did not specifically hold that the ultimate question of whether a transaction is a sham is to be reviewed under the clearly erroneous standard." *AEP*, 326 F.3d at 742. Furthermore, employing different standards of review for the factual and ultimate questions is more consistent with the Supreme Court's teaching that "[t]he general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978). Both parties agree that although factual findings are reviewed for clear error, the ultimate question of whether the transaction is an economic sham is reviewed de novo. Appellant's Br. at 33; Appellee's Br. at 38.

[9] The district court did not specify how large this infusion would have had to be in order to make the COLI plans profitable. Based on the following evidence and findings, however, we can infer that the figure was quite large indeed — about $315 million.

With respect to the Great West plan, Dow asserts that it relied on two illustrations (Cash Flow #1 and #2) in making its purchase decision. Appellee's Br. at 12. The district court credited "Dow's intention to cap loans at $50,000 and withdraw only to basis," *Dow I*, 250 F. Supp. 2d at 802, which reflects only Cash Flow #1, Appellee's Br. at 9. This illustration shows cash infusions of about $30 million during the middle years. Joint Appendix ("J.A.") at 1711.

With respect to the MetLife plan, the district court credited Dow's assertion that it relied on an illustration called Case #23. *Dow I*, 250 F. Supp. 2d at 809; Appellee's Br. at 16. This illustration shows cash infusions of about $285 million during the middle years (after multiplying the illustration's per-insured infusion by the 17,800 employees that Dow projected to be covered by the plan, *Dow I*, 250 F. Supp. 2d at 784-85; Appellee's Br. at 15). J.A. at 898.

[10] "In transactions that are designed to yield deferred rather than immediate returns, present value adjustments are, as the courts have recognized, an appropriate means of assessing the transaction's actual and anticipated economic effects." *ACM P'ship v. Comm'r*, 157 F.3d 231, 259 (3d Cir. 1998) (citing cases).

The government objects to the district court's finding that Dow intended to inject large amounts of cash into the plans in their middle years. Reversing this finding would have a domino effect favorable to the government: it would undermine the finding that the plans would generate positive cash flows in their later years, which would in turn preclude the finding that each plan had a positive NPV. Review of this factual finding for clear error is only necessary, however, if such highly-contingent cash flows are relevant as a matter of law to the economic-sham analysis. Unfortunately, the prior COLI-plan decisions are unhelpful in resolving this legal question because in each case the court found the pre-deduction cash flow to be negative for every year of the plan, and there was no possibility of future profitability upon the materialization of some contingency.[11]

The Supreme Court has, however, provided useful guidance. In *Knetsch v. United States*, 364 U.S. 361 (1960), the Court reviewed a transaction involving the taxpayer's purchase of $4 million worth of 30-year bonds and his simultaneous borrowing against them, which generated hundreds of thousands of dollars in interest deductions in just two years. *Id.* at 362-63. The taxpayer terminated the transaction after three years: he surrendered the bonds (now worth $4,308,000), his loan (now worth $4,307,000) was cancelled, and he received the difference ($1,000). *Id.* at 364. The Court upheld the IRS's disallowance of the taxpayer's loan-interest deductions as the product of a sham transaction. *Id.* at 366.

Two aspects of the Court's opinion shed light on the current inquiry. First, the Court observed that if, instead of terminating the transaction, the taxpayer had held the bonds to maturity and continued to operate as he had done for the first three years, he would have received an annuity worth $1,000. *Id.* at 364. Second, the Court summarily rejected the taxpayer's argument that the transaction would have become profitable in ten years if he paid off the original $4 million loan. *Id.* at 366 n.3. The first statement demonstrates that potential future profitability can be relevant in assessing whether an ongoing transaction is an economic sham. The contrast between the first and second statements reflects a more nuanced lesson. Courts may consider future profits contingent on some future taxpayer action, but only when that action is consistent with the taxpayer's actual past conduct. Courts should be skeptical, however, when the asserted future profits hinge on future taxpayer action that seriously departs from past conduct, especially where such departure involves the expenditure of large sums of money.[12]

These principles have obvious relevance to the instant case. It was proper for the district court to consider whether Dow's plans would be profitable in the future; indeed, in each prior COLI-plan case, the court looked to future cash flows. The same cannot be said, however, for the district court's consideration of positive cash flows that were contingent on Dow's eventual spending of significant amounts of cash. Like the transaction in *Knetsch*, the instant COLI plans would become profitable only upon the taxpayer's large future outlay of additional cash, and, considering that Dow had heretofore made no similar cash infusions, such additional spending would be a drastic departure

---

[11] Beyond the COLI-plan context, courts have disfavored the deduction of interest paid on investments with contingent benefits. *See, e.g.*, *Coleman v. Comm'r*, 87 T.C. 178, 208-09 (1986), *aff'd*, 833 F.2d 303 (3d Cir. 1987); *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 92-93 (4th Cir. 1985); *Smoot v. Comm'r*, 61 T.C.M. (CCH) 2897, 1991 WL 97650 (1991); *Goldwasser v. Comm'r*, 56 T.C.M. (CCH) 606, 1988 WL 118617 (1988); *Zegeer v. Comm'r*, 54 T.C.M. (CCH) 1203, 1987 WL 49205 (1987).

[12] The dissent objects to our reading of *Knetsch*, asserting that the Court simply "determined that the taxpayer did not *intend* to make the greater future investment by paying off the loan, and *therefore*, the potential future cash flows were not relevant to the economic substance analysis." Dissent at 11. Our reading of *Knetsch* is consistent with this statement. What the dissent ignores (and we recognize) is the *reason* behind the Court's determination: the large future investment would be altogether inconsistent with his past conduct. This is what made paying off the loan "wholly unlikely." *Knetsch*, 364 U.S. at 366 n.3.

from the taxpayer's past conduct.[13]   Moreover, there was no contractual provision requiring Dow to make substantial cash infusions in the future.  In light of the teachings of *Knetsch*, the district court erred in including in its cash-flow analysis the highly-contingent positive cash flows projected for later years.[14]   When the future infusion of cash is properly removed from the analysis, only negative cash flows remain.  Therefore, without the benefit of the interest deductions, the COLI plans were cash-flow negative for all relevant periods, which is a "hallmark[] of an economic sham." *AEP*, 326 F.3d at 742.

Our holding that the future positive cash flows should have been ignored makes it unnecessary to reach the government's appeal of the district court's (i) choice of discount rate to credit in the NPV analysis and (ii) exclusion of Dow's tax protest letters under Rule 408 of the Federal Rules of Evidence.  First, the removal of the highly-contingent positive cash flows from the analysis leaves only negative cash flows, which of course yield a negative NPV no matter what the discount rate.  Second, the government offered the tax protest letters to cast doubt on Dow's intent to inject large amounts of cash into the plans in the future, which is irrelevant in light of our holding that this putative additional outlay (or, more precisely, the profits contingent on such spending) should be disregarded as a matter of law.

### 2.  Inside Build-Up

In each prior COLI-plan case, the court found that the plan ensured that at regular intervals net equity was adjusted to zero or some small number.  *AEP*, 326 F.3d at 740, 742; *CM Holdings*, 301 F.3d at 103; *Winn-Dixie Stores, Inc. v. Comm'r*, 113 T.C. 254, 281, 284 (1999).  This low or zero net equity precluded the taxpayer from realizing the benefit of inside build-up, because there would be little or no net equity to build up (i.e., earn interest).

The district court found that "on the last day of each of policy years four through seven, the cash value of Dow's Great West and MetLife policies was fully encumbered, yielding virtually zero

---

[13]As the facts recited in the text demonstrate, the policy premiums had been funded principally through loans against and withdrawals from the policies, with Dow using little of its own cash.  Yet the $315 million in projected future investments purportedly would have been coupled with Dow limiting its borrowing and withdrawals.  *Dow I*, 250 F. Supp. 2d at 801-02, 807, 809-10.  On these facts, there can be no doubt that the projected cash infusions would have required Dow to depart drastically from its past conduct.  Thus, we leave for another day the consequences of less drastic departures.  This obviates the dissent's concern that our holding prohibits the consideration of contingent future profits whenever it depends on future investment that is merely "greater than the past investment."  Dissent at 11.

Also, without citing any authority, the dissent argues that we should also consider "whether the projected future investment is feasible and there is evidence that it is likely to occur."  Dissent at 11.  While we agree that the *in*feasibility of a future investment is indicative of a sham transaction, the fact that an investment *is* feasible is less likely to provide useful information because large future investments will almost always be feasible for large corporations or other resource-rich taxpayers.  A factor that is too easily met is no factor at all.

A likelihood factor presents problems of its own.  How would one determine likelihood, i.e., what types of evidence would one consider?  (The dissent does not say.)  One possibility is the profitability of the transaction, because a taxpayer is more likely to make a future investment if it will make the transaction profitable.  But this would be circular, requiring us to look to the profitability of the transaction to determine the likelihood of the investment, which we would then use to determine the economic substance (i.e., profitability) of the transaction all over again.  Another possibility is the taxpayer's plans, because internal deliberations might show that a future investment is likely to occur.  But that crosses over to the subjective inquiry that we do not conduct until the transaction is determined to have economic substance in the first place.  *Illes*, 982 F.2d at 165.  In light of these difficulties, the better course is to remain true to *Knetsch* by limiting the inquiry to whether the future investment drastically departs from past conduct.

[14]We do not hold that future profits contingent on new expenditures by the taxpayer may *never* be considered. For example (as we suggest in the text), if a taxpayer were contractually obligated to infuse additional cash into an investment at some point in the future, such spending would not constitute a serious departure from past conduct that should be disregarded under *Knetsch*.  Instead, the eventual outlay would be consistent with actual past conduct, i.e., the obligation that existed all along.  Of course, Dow was under no such obligation in the instant case.

net equity." *Dow I*, 250 F. Supp. 2d at 814. The district court also noted that Gary Lake, an actuarial consultant who advised Dow on the COLI plans, *id.* at 766, "stated that for some of the years the purpose was to have low net equity," *id.* at 774. Based on its finding that in the future Dow would infuse the plans with large sums of cash, however, the district court held that the company "stood to realize substantial economic gain from tax-free inside build-up" with respect to both plans. *Id.* at 807; *see also id.* at 810.

For the same reasons discussed above in the context of cash flows, the district court erred in considering in its inside build-up analysis the prospect of large cash investments that might be (but did not have to be) made in the future. Instead, given the district court's factual findings with respect to Dow's actual conduct of maintaining little or no net equity, a simple application of *AEP*, *CM Holdings*, and *Winn-Dixie* yields the result that Dow would have been unable to realize the benefit of inside build-up. This conclusion further suggests that the COLI plans were an economic sham.

### 3. Mortality Gains

The district court found that the plans contained features designed to neutralize the taxpayer's ability to realize mortality gains. The district court nevertheless found that the COLI plans were not mortality neutral because neither one "contain[ed] a 100% retrospective adjustment mechanism," a requirement that the court divined from the three prior COLI-plan decisions.[15] *Dow I*, 250 F. Supp. 2d at 811; *see also id.* at 808, 810. The district court reiterated its application of this 100%-adjustment requirement when it explained in its amended opinion that "a plan that is not designed to *eliminate every dime of mortality profit . . .* cannot be 'mortality neutral' over the long term." *Dow II*, 278 F. Supp. at 851 (emphasis added).

In the three prior COLI-plan cases, the mortality provisions were deemed neutral, making the potential for mortality gains a sham. Yet two of the three previously challenged plans clearly did *not* eliminate 100% of all mortality gains and losses. In *CM Holdings*, the taxpayer received a total mortality gain of $1.3 million over the first eight years of the plan. 301 F.3d at 101. The Third Circuit noted that the insurance company "assessed [the taxpayer] surcharges . . . to recoup its losses and ensure mortality neutrality going forward." *Id.* at 103. The *CM Holdings* district court's description of the plan reveals, however, that these surcharges did not constitute a 100% elimination of mortality gains. The plan contained a provision capping maximum cost-of-insurance ("COI") charges, which led the district court to conclude that the insurance company "may never recoup [the taxpayer's] mortality windfall through increased COI charges." *In re CM Holdings*, 254 B.R. 578, 635 & nn.70-71 (D. Del. 2000).

The precise details of the mortality-neutralizing provision in *AEP* are less clear than in *CM Holdings* but still suggestive of less-than-complete elimination of mortality gains. The taxpayer was advised that the plan's mortality mechanism would "result in a *much closer* match" between

---

[15]The district court read the three cases as follows:

> [C]ourts found that the COLI plans were flawed because of devices designed into the plans that eliminated the transfer of risk. Those courts thus adopted the government's terminology and found that the plans were "mortality neutral" when, after the relevant period, usually a year, the cost of insurance (COI) and death benefits were "trued up" retrospectively. That is, when there is an agreement contained in the plan to make payments after the conclusion of a policy year so that the COI equals the amount paid out in death benefits, risk is eliminated and, as insurance, the COLI transaction is economically meaningless.

*Dow I*, 250 F. Supp. 2d at 807-08 (citing *Winn-Dixie*, 113 T.C. at 268-69, 285; *IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 254 B.R. 578, 632-35 (D. Del. 2000); *Am. Elec. Power Co. v. United States*, 136 F. Supp. 2d 762, 777, 787-88 (S.D. Ohio 2001)).

expected and actual death benefits.[16] *Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 777 (S.D. Ohio 2001) (emphasis added). The use of the phrase "much closer" rather than a word like "complete," "total," or "absolute" implies that the plan did not provide for 100% adjustment. Indeed, over a nine-year period, the taxpayer experienced a mortality loss (i.e., there were *fewer* deaths than expected, so it received *less* in death benefits than it paid for) of $38.8 million between projected and actual death benefits that apparently went unadjusted. *Id.* at 788. There is nothing in the opinion to indicate that a mortality *gain* would have been completely eliminated even though a mortality *loss* was left uncorrected. Further supporting this conclusion is the fact that the plan in *AEP* was "the same COLI plan . . . offered by the same insurer and sold by the same brokers" as the one in *CM Holdings*, *id.* at 768-69, which (as has already been shown) limited the insurer's ability to recoup the taxpayer's mortality gains.

Finally, the precise details of the mortality-neutralizing provision in *Winn-Dixie* are unclear. The plan provided for the creation of a claims-stabilization reserve ("CSR") that was funded by COI charges and from which death claims were paid. *Winn-Dixie*, 113 T.C. at 268. If the taxpayer experienced mortality gains in a given year, then the excess was deducted from the CSR. *Id.* at 268-69. "[T]he function of the claims stabilization reserve was to ameliorate fluctuations in actual mortality experience." *Id.* at 285. The *Winn-Dixie* district court's opinion does not elaborate, however, what would happen if the taxpayer's mortality gains exhausted the CSR. While one might imagine the insurer recouping the gains through some other mechanism, one might also imagine the taxpayer keeping any mortality gains over and above the value of the CSR. In light of this uncertainty, the district court below could not have concluded that the *Winn-Dixie* plan provided for the complete elimination of mortality gains.

This review of the cases demonstrates that a "100% retrospective adjustment mechanism" requirement simply cannot be discerned from the past COLI-plan cases. In fact, a rule that permitted a COLI plan to be deemed mortality neutral only upon proof that "every dime of mortality profit" is eliminated would outright conflict with the facts of two of the three cases. Therefore, the district court erred by imposing such a high hurdle as a prerequisite to finding that Dow's plans were designed to neutralize mortality gains.

When this erroneously high bar is removed, it is clear that the COLI plans were designed to reduce (even if not by 100%) Dow's ability to realize mortality gains. The Great West plan permitted the insurer to recoup its mortality losses (i.e., Dow's mortality gains) through rate adjustments. *Dow I*, 250 F. Supp. 2d at 808. The MetLife plan gave the insurer "the right to increase COI charges to recoup losses if claims for death benefits exceeded COI charges." *Id.* at 810. The fact that such increase was limited by a stop-loss provision, *id.*, is no bar to a finding of mortality neutrality, because (as discussed above) the recoupment mechanism in *CM Holdings* also was capped. It is apparent, then, that these features are sufficiently similar to the other COLI-plan cases for us to conclude that Dow would not significantly benefit from mortality gains. This conclusion provides further evidence that the COLI plans were an economic sham.

### 4.  Summary

Courts have recognized three non-tax benefits relevant to the economic-substance analysis of COLI plans: positive cash flows, inside build-up, and mortality gains. Dow's COLI plans did not generate any of these benefits. Because the plans did not have "any practicable economic effects

---

[16] Contrary to the dissent's assertion, Dissent at 14, the next sentence of the advice given the taxpayer — "This will eliminate any volatility or variation in the cash flow that we are expecting in each year of the plan" — does not undermine the sentence quoted in the text. Indeed, the use of the qualifier "that we are expecting" to modify "volatility or variation" suggests that the taxpayer's mortality gains would not be completely eliminated if they exceeded expectations.

other than the creation of income tax losses," *Rose*, 868 F.2d at 853, we conclude that they had no economic substance. This conclusion makes it unnecessary to discuss Dow's subjective motivation. *Illes*, 982 F.2d at 165.

### III. CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's judgment and remand for entry of judgment in favor of the United States.

———————

**DISSENT**

———————

RYAN, Circuit Judge, dissenting. My colleagues conclude that, as a matter of law, future profits contingent on taxpayer action are an appropriate component of the economic substance calculus *only* when that action comports with the taxpayer's actual past conduct related to the transaction in question. I disagree. In my opinion, there is no such precedential rule of law and no warrant for creating one in this case. The validity of Dow's COLI plans as investments having economic substance turns on the district court's findings of fact and the sufficiency of evidence supporting those findings. I would affirm the judgment in favor of Dow because I believe that the district court correctly applied the law of this circuit to factual findings that are not clearly erroneous.

I have no disagreement with the majority opinion's statement of the complex factual details of Dow's COLI program, and its summary of the general principles of this court's economic substance doctrine. My disagreement is with the legal principles my colleagues invent and mistakenly attribute to *Knetsch v. United States*, 364 U.S. 361 (1960).

I agree with my colleagues that *Knetsch* demonstrates that potential future profitability is relevant to the inquiry of whether a long-term investment plan is an economic "sham," as that unfortunate term has been used by the IRS and some of our federal courts. But my colleagues read into *Knetsch* far more than the Supreme Court wrote in that case concerning the Court's refusal to accept the taxpayer's argument that the transaction would have become profitable in ten years had he paid off the original $4 million loan.

The Supreme Court did not summarily reject the taxpayer's argument; rather, it stated that the argument was "predicated on the wholly unlikely assumption that Knetsch would have paid off in cash the original $4,000,000 'loan.'" *Id.* at 366 n.3. My colleagues insist that this language implies a general principle of law that future profits are not even *relevant* to the economic substance inquiry when the taxpayer's projected future investment in a particular plan is greater than its past investment in that plan, regardless whether the projected future investment is feasible and there is evidence that it is likely to occur. I read *Knetsch* to indicate only that the Court made a credibility assessment and determined that the taxpayer did not *intend* to make the greater future investment by paying off the loan, and *therefore*, the potential future cash flows were not relevant to the economic substance analysis. The Court did not hold that, as a matter of law, a feasible projected future investment of cash in a particular plan is irrelevant to the economic substance inquiry, when that investment is greater than the past investment in that plan. The question is what the taxpayer intended.

If Dow's potential future cash flows are not arbitrarily excluded from the economic substance inquiry, this case turns on the district court's findings of fact regarding the intended operation of Dow's COLI plans. The district court made two crucial findings of fact: (1) Dow intended to operate its plans such that it would realize the benefits of tax-deferred inside buildup; and (2) Dow's plans transferred mortality risk to the insurers on the aggregate. The court then correctly applied the legal principles set down in the so-called sham-COLI cases, and concluded that, unlike the sham COLI plans, Dow's plans had economic substance as a long-term investment program.

The sham-COLI cases explain that the two main benefits of life insurance plans other than the potential for tax *deductions* are: (1) mortality payments to the beneficiary, which are not taxable; and (2) the accrual of tax-deferred interest on policy value (inside buildup), that is, the

increase in the policy's cash value attributable to interest income earned upon the investment of the cash value. The plans in the sham-COLI cases were economic shams because they failed to realize *either* of the two benefits of a life insurance plan and because they were created solely for the tax benefit of deductions. *See Am. Elec. Power Co. v. United States*, 326 F.3d 737 (6th Cir. 2003) (*AEP*); *In re CM Holdings, Inc.*, 301 F.3d 96 (3d Cir. 2002); *Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313 (11th Cir. 2001).

In this case, the district court concluded, on the basis of its two central factual findings, that, unlike the sham-COLI plans, Dow's COLI plans realized both of the non-deduction benefits of life insurance policies and therefore had economic substance. Unless *both* of those factual findings by the district court are clearly erroneous—and I conclude they are not—the court's judgment for Dow should be affirmed.

## I. Inside Buildup

The first basis for the district court's determination that Dow's COLI plans had economic substance was its finding that Dow would realize the benefits of the tax-deferred inside buildup of the policies. There were no such benefits in the COLI plans found to be shams in *AEP*, *CM Holdings*, and *Winn-Dixie*. Dow's pre-purchase projections showed that the plans generated positive cash flows, even in the absence of the interest deductions. The district court noted that although the pre-deduction cash flows were negative for the first 18 years of the plan, positive cash flows, delayed for 18 years, were consistent with Dow's subjective business purpose of funding retiree benefit expenses in the long term. *Dow Chem. Co. v. United States*, 250 F. Supp. 2d 748, 806 (E.D. Mich. 2003).

I think the district court got it right, in first analyzing each of Dow's COLI plans as a *whole* and then correctly concluding that the plans had economic substance, because, among other things, they realized the benefits of inside buildup. That conclusion rested, first, upon the court's factual finding that Dow intended from the outset to cap policy loans at $50,000, to withdraw funds only to basis, and to invest cash into the Great West and MetLife plans after 17 years. *See id.* at 802, 809. The district court based this finding not only on the testimony of Dow's witnesses, but also on contemporaneous documentation introduced by Dow, including Dow's original 1987 Request for Proposals (RFP) to the insurance industry; analysis of proposals by Dow's actuarial consultant and his final recommendation; and pre-purchase cash flow illustrations. *Id.* In addition, the district court noted that a strategy of capping policy loans at $50,000 and withdrawing only to basis was more consistent with Dow's purpose of producing cash flows to fund future retiree benefit expenses than a minimum-payment strategy because the capped-loan strategy produced higher positive cash flows after 18 years. *Id.* at 801-02. The capped-loan strategy was also more consistent with Dow's overall goal of tax avoidance than the minimum payment strategy because interest on loans above $50,000 was not tax deductible, and withdrawing cash above basis would have exposed Dow to taxes that could have been avoided if that cash had been paid out as death benefits. *Id.*

### A. Net Present Value (NPV) Analysis

The district court's conclusion that Dow's COLI plans had economic substance because they generated inside buildup was based, in part, upon the court's acceptance of the net present value (NPV) analysis of Dow's financial expert. That was a finding of fact, and I am satisfied the court did not commit legal error in accepting Dow's, rather than the government's, NPV analysis.

Courts have recognized that NPV analysis is an appropriate method to determine the economic effects of transactions designed to yield deferred returns. *ACM P'ship v. Comm'r*, 157 F.3d 231, 259 (3d Cir. 1998). NPV analysis consists of discounting future earnings by a factor

intended to reflect the time value of money. *See Dow*, 250 F. Supp. 2d at 806. The discount rate used is the rate of return on an alternate investment.

The district court accepted the testimony of Dow's expert, Stewart Myers, who stated that the appropriate discount rate for the NPV analysis of Dow's delayed cash flows is an "after-tax" Moody's Corporate Average, which is calculated by multiplying Moody's Corporate Average by a factor of one minus Dow's tax rate. This adjusted discount rate reflects the reality that the death benefits from Dow's COLI plans were not taxable, whereas Dow would have to pay tax on the income from alternate investments. Dow's actual return from alternate investments would be reduced by its income tax rate, but its return from the COLI plans would not.

The government argues that, as a matter of law, the proper discount rate is an unadjusted Moody's Corporate Average because using a discount rate that reflects the tax-free nature of death benefits conflicts with the "pre-tax" analysis required by this circuit and the Third Circuit, and mistakenly puts Dow in a "world without taxes." *See AEP*, 326 F.3d at 743-44; *CM Holdings*, 301 F.3d at 95.

I do not agree with the government's argument that the "pre-tax" analysis required in this circuit under *AEP* requires an unadjusted discount rate. As the Third Circuit explained in *CM Holdings*, this "pre-tax" analysis requires only that there be removed from consideration the challenged deduction and the transaction be evaluated on its merits. *CM Holdings*, 301 F.3d at 105. It is not necessary, as the government suggests, that we must imagine a "world without taxes," and we may take into account the reality that some investments are tax favored.

Dow's expert separated Dow's COLI transactions into their investment and financing components or "legs" and analyzed the cash flows from each leg separately. The "investment leg" cash flows showed the benefits from inside buildup, whereas the "financing leg" cash flows showed the value added from financing—in this case, the interest deductions. The government does not claim that separating the investment and financing legs, as Dow's expert did, is not standard practice in financial analysis.

Dow's expert concluded that the investment leg of Dow's MetLife plan had an NPV of approximately $370 million and the investment leg of the Great West plan had an NPV of $76 million at the after-tax discount rate. By analyzing the investment leg separately, Dow's expert viewed the transaction as a whole—from beginning to end—but removed the challenged deduction from consideration as *AEP* requires. By using an after-tax discount rate, he recognized the reality that corporations operate in a world with taxes and that some investments are tax favored. Since Dow's expert's analysis is a form of the "pre-tax" analysis required by this court in *AEP*, I am satisfied that the district court did not commit legal error by accepting Dow's expert's NPV analysis.

## II. Mortality Gains

The second basis for the district court's determination that Dow's COLI plans had economic substance was its finding that, unlike the sham COLI plans, Dow's COLI plans transferred mortality risk to the insurers on the aggregate and therefore were not mortality neutral. There is no basis for concluding that this factual finding was clearly erroneous, and I disagree with my colleagues that the district court committed legal error in distinguishing the mortality features in Dow's COLI plans from those in *AEP* and *CM Holdings*.

This circuit in *AEP* and the Third Circuit in *CM Holdings* found that the plans in those cases were designed and operated to be "'mortality-neutral,' with neither side making money on the risk of employees dying early or late." *CM Holdings*, 301 F.3d at 104. "[T]he chance of mortality gains ever being enough to render the plan pre-tax profitable was essentially nonexistent." *Id.* Neither

the taxpayer nor the insurance company was able to benefit from the timing of employee deaths because the insurance company paid the taxpayer "mortality dividends" if the cost of insurance exceeded death benefits and assessed COI surcharges if the taxpayer's death benefits exceeded actuarial projections. *AEP*, 326 F.3d at 740; *CM Holdings*, 301 F.3d at 104-05.

Although, as my colleagues point out, the insurance company in *CM Holdings* did pay out $1.3 million in mortality gains in the early years of the plan, the Third Circuit found the plan was designed to eliminate retrospectively the taxpayer's ability to realize mortality gains because, "[r]ather than accept this loss as one that may sometimes occur no matter how carefully actuaries attempt to chart the vagaries of life and death, [the insurance company] assessed surcharges to recoup its losses and ensure mortality neutrality in the future." *CM Holdings*, 301 F.3d at 104-05. As the lower court in *CM Holdings* explained, although the insurer may never recoup the taxpayer's mortality gains, "this is a function of a policy contract provision capping maximum COI charges, not a function of risk shifting." *In re CM Holdings, Inc.*, 254 B.R. 578, 635 (D. Del. 2000).

The plan in *AEP* was also designed to eliminate retrospectively the taxpayer's ability to realize mortality gains. My colleagues selectively quote the advice received by the taxpayer to support their argument that the plan in *AEP* was not designed to provide a 100% adjustment. However, when that advice is quoted in its entirety, it supports the opposite conclusion:

> [A representative] advised AEP that "this mortality mechanism will result in a much closer match between expected cash flow from projected death benefits and claims that are actually paid. This will eliminate any volatility or variation in the cash flow that we are expecting in each year of the plan."

*Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 777 (S.D. Ohio 2001) (citation omitted).

In contrast, the district court below found that Dow's COLI plans did not contain retroactive adjustment mechanisms designed to eliminate the transfer of mortality risk by equating the COI with the death benefits paid. The district court found that the Great West plan paid Dow dividends to share favorable mortality experience, but those retrospective adjustments could not equalize COI and death benefits paid because Dow's plans were part of a pool of COLI plans that shared the mortality experience upon which the dividends were paid. *Dow*, 250 F. Supp. 2d at 808. The Great West plan also had an adjustment feature which increased the COI to account for prior unfavorable mortality experience, but that was a prospective measure "designed to fine tune the risk allocation going forward," not a retrospective measure designed to eliminate past risk transfer. *Id.* The MetLife plan also paid mortality dividends, but they did not transfer risk away from the insurance company, and benefitted only Dow. *Id.* at 810. MetLife also reserved the right to increase COI charges to recoup losses if mortality experience was unfavorable, but that right to adjust was limited by a stop-loss provision, which is common in group life insurance contracts. *Id.*

The district court concluded that Dow's COLI plans had features that were designed to reduce but not eliminate the mortality risk transferred to the insurers. The court found that Dow had the potential to realize substantial mortality gains, including catastrophic loss, which was a realistic possibility given that Dow's employees, unlike those in *Winn-Dixie*, were located in concentrated geographic areas. *See Winn-Dixie Stores, Inc. v. Comm'r*, 113 T.C. 254, 284-85 (1999). There is no basis for concluding that the district court's factual finding that Dow had the potential to realize mortality gains because its COLI plans transferred mortality risk to the insurers, on the aggregate, was clearly erroneous or that its conclusion that Dow's COLI plans were not mortality neutral was erroneous as a matter of law under *AEP*.

### III.  Subjective Business Purpose

A close study of Dow's COLI plans shows that Dow's plans were not the same as those found to be shams in *AEP*, *CM Holdings*, and *Winn-Dixie*, and that Dow did not enter into the plans for the sole purpose of tax avoidance.  The sham COLI plans shared a number of features that indicated a sole purpose of tax avoidance.  First, the taxpayers that  operated those plans always chose the highest possible interest rates for their policy loans, or at least the highest rates they thought would pass IRS scrutiny.  *See CM Holdings*, 301 F.3d at 100; *Winn-Dixie*, 254 F.3d at 1315; *Am. Elec.*, 136 F. Supp. 2d at 787.  The choice of such high, commercially unreasonable rates was rational because those rates allowed the taxpayers to maximize their interest deductions without increased cost due to the fixed 1% spread between the loan interest rate and the credited rate on the policy value.  In contrast, Dow chose a commercially reasonable interest rate for its policy loans based on Moody's Corporate Average, a typical and regulatory-favored rate for policy loans.  *Dow*, 250 F. Supp. 2d at 813.

The sham COLI plans also offered loaned crediting rates that greatly exceeded their unloaned crediting rates.  For example, in *CM Holdings*, the unloaned crediting rate was the greater of 4% or a rate declared by the insurance company, and the loaned crediting rate varied between approximately 9% and 13%; and the *Winn-Dixie* plan offered an unloaned crediting rate of 4% and a loaned crediting rate of 10.66%.  *See CM Holdings*, 254 B.R. at 594-95, 606; *Winn-Dixie*, 113 T.C. at 281.  These large differentials deviated from standard insurance industry practice and created a very strong incentive to continue taking policy loans throughout the life of the plan.  *See CM Holdings*, 254 B.R. at 585-86.  In contrast, there was a much smaller differential between Dow's MetLife unloaned and loaned crediting rates, and Dow's Great West unloaned and loaned crediting rates were identical.  *Dow*, 250 F. Supp. 2d at 778, 789.  Dow's MetLife unloaned crediting rates were between 4% and 6.81%, and its loaned crediting rates were between 4% and 8.65%.  *Id*. at 789.  Dow also negotiated a higher unloaned crediting rate for the MetLife policies to begin in year 18.  *Id.* at 809.  Dow's unloaned and loaned crediting rate choices encouraged Dow to cap policy loans at $50,000 and invest cash into its COLI plans after the 17th year.

The taxpayers in *AEP*, *CM Holdings*, and *Winn-Dixie* also discontinued their plans after Congress passed the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and phased out the interest deductions on COLI plans even though their proposed corporate purposes of funding retiree benefit expenses did not require cancellation of the plans.  *See AEP*, 326 F.3d at 740; *CM Holdings*, 301 F.3d at 101; *Winn-Dixie*, 254 F.3d at 1315.  In contrast, Dow stopped paying premiums on its MetLife policies, but otherwise kept its COLI plans intact after the passage of HIPAA.  *Dow*, 250 F. Supp. 2d at 793-94.  There is no reason to conclude that Dow's COLI plans lacked economic substance.

### IV.  Evidentiary Rulings

The majority opinion, given its treatment of the "economic substance" issue, does not address the government's argument that the district court abused its discretion in excluding Dow's IRS protest letters as "[e]vidence of conduct or statements made in compromise negotiations" under Fed. R. Evid. 408.  Dow's IRS protest letters included cash-flow illustrations that did not show loans capped at $50,000.  *Dow*, 250 F. Supp. 2d at 802.

The district court's factual finding that Dow submitted the protests in compromise negotiations is reviewed for clear error.  *Trans Union Credit Info. Co. v. Associated Credit Servs., Inc.*, 805 F.2d 188, 192 (6th Cir. 1986).  The court's ruling that the protests were inadmissible is reviewed for an abuse of discretion.  *United States v. Logan*, 250 F.3d 350, 366 (6th Cir. 2001).

The government argues that Dow's protest letters were not "made in compromise negotiations" because they were filed with the IRS Examination Division rather than the Appeals Division, whose mission is to resolve tax controversies. *Dow*, 250 F. Supp. 2d at 803. It asserts that the Examination Division's investigation process is an adversarial one that involves determining whether the IRS erred. *Id.*

The district court found that, given the undisputed facts that large corporate taxpayers protest the vast majority of IRS disallowances and that the great majority of those protests are settled, Dow reasonably believed that it must first file a protest before it could reach the Appeals Division and compromise its claim. *Id.* at 805-06. Largely on this basis, the district court found that the protests were "made in compromise negotiations" and excluded them under Rule 408. *Id.* at 806. I am unable to conclude that the district court's factual finding regarding Dow's IRS protests was clearly erroneous.

Federal trial courts have wide discretion in determining whether to admit offers of settlement for "another purpose." District Judge David Lawson, the trial judge below, is a nationally recognized writer and lecturer in the Federal Rules of Evidence. He would have had in mind the policy objective of Rule 408 to "'weigh the need for such evidence against the potentiality of discouraging future settlement negotiations.'" *See Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (citation omitted).

The government also argues that Dow's protests should not have been excluded because they were being offered to impeach rather than to prove liability or damages. The district court found that there is little difference between using a statement to impeach the denial of liability and offering it to prove liability and therefore refused to apply the "another purpose" exception of Fed. R. Evid. 408 and admit the evidence. *Dow*, 250 F. Supp. 2d at 805.

I agree that using settlement evidence to impeach the denial of liability is virtually indistinguishable from using it to prove liability; both uses would equally discourage settlement negotiations. We do not review the district court's evidentiary ruling *de novo*, and I am satisfied the district judge did not abuse his discretion.

## V. Conclusion

I respectfully dissent because I disagree with the majority's conclusion that, as a matter of law, future profits contingent on taxpayer action are relevant to the economic substance inquiry *only* when that action comports with the taxpayer's actual past conduct related to that particular transaction. I also disagree with my colleagues' conclusion that Dow's COLI plans were mortality neutral and that the district court erred in distinguishing the mortality features of Dow's COLI plans from those in the sham-COLI cases.

I would affirm the judgment in favor of Dow because I believe that the district court correctly applied this court's economic substance doctrine, did not commit legal error in accepting the NPV analysis of Dow's expert, did not abuse its discretion in excluding Dow's protest letters from evidence, and did not commit clear error in making its central factual findings.